**UNITED STATES of America, Appellee,**

v.

**Franklin Evon SEBETICH a/k/a Frank, Earl Dean, Jr., a/k/a Dooney, Michael John Buhovecky, Appellants.**

Nos. 84–3656, 84–3665 and 84–3685.

United States Court of Appeals, Third Circuit.

Argued June 12, 1985.

Decided Oct. 31, 1985.

John T. Olshock, Thomas J. Graham (argued), Finder, Allison, Olshock and Graham, Washington, Pa., for appellant Dean in No. 84–3656.

George E. Schumacher, Federal Public Defender, Thomas S. White (argued), Asst. Federal Public Defender, Pittsburgh, Pa., for appellant Franklin Sebetich in No. 84–3665.

Thomas J. Michael (argued), Pittsburgh, Pa., for appellant Buhovecky in No. 84–3685.

J. Alan Johnson, U.S. Atty., Paul J. Brysh (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

Before HIGGINBOTHAM and BECKER, Circuit Judges, and LACEY, District Judge[*].

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is a consolidated appeal by three defendants from judgments of conviction on charges arising out of three bank robberies. Appellant Franklin E. Sebetich was indicted on charges of robbing the Cal-Ed Federal Credit Union in California, Pennsylvania; of robbing a branch of Equibank in Finleyville, Pennsylvania; of robbing the Union National Bank of Pittsburgh in Bentleyville, Pennsylvania; and of placing the lives of tellers in jeopardy during the commission of these robberies. Sebetich was convicted of Counts II and III of the charges arising out of the Cal-Ed robbery and sentenced to twenty years' imprisonment. Appellant Michael John Buhovecky was indicted on charges of robbing the Union National Bank branch in Bentley-

---

[*] Honorable Frederick B. Lacey, United States District Judge for the District of New Jersey, sitting by designation.

ville, and of placing the lives of the bank's tellers in jeopardy. Buhovecky was convicted on both counts and sentenced to twenty years' imprisonment. Appellant Earl Dean, Jr., was indicted on charges of participating in all three robberies and of placing the lives of tellers in jeopardy in connection therewith. Dean was convicted of the charges involving the Bentleyville and Finleyville banks and sentenced to two concurrent twenty-year terms of imprisonment. All three appellants were also indicted on charges of conspiring to rob federally insured banks and credit unions. Buhovecky and Dean were convicted of that charge and sentenced to five years' imprisonment each, to run concurrently with their other sentences.[1]

The appellants raise a host of issues, including an attack on the sufficiency of the indictment, a contention that there was unconstitutional pre-indictment delay, a claim of illegal search and seizure, and a variety of attacks upon the district court's evidentiary and procedural rulings at trial. For the reasons that follow, we reject all but three of these arguments. Because we conclude that the district court erroneously rejected Sebetich's proffer of expert testimony on the subject of the reliability of eyewitness identification, we vacate the judgment of conviction against Sebetich on the charge of robbing the Cal-Ed bank, and remand so that the district court may hold a hearing in accordance with our opinion in *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985). We affirm the convictions of Buhovecky with respect to the Bentleyville robbery, but reverse Buhovecky's conviction for conspiracy, instruct the district court to enter a judgment of acquittal with respect to that count, and remand for resentencing on the remaining bank robbery counts.[2] Finally, we affirm the convictions of Dean on the counts relating to the Bent-

leyville robbery and the conspiracy count, but we vacate the judgments of conviction against him on charges stemming from the Finleyville robbery and remand for further fact-finding concerning the seizure of physical evidence linking Dean to that robbery. If the district court determines that no constitutional infirmity barred admission of the evidence, it will reinstate this conviction.

## I. FACTS

Between the months of March and August 1979, two banks and a federal credit union located in three neighboring western Pennsylvania communities were robbed by men wearing ski masks. The evidence adduced at trial concerning these robberies is essentially as follows.

A. *The Cal-Ed Robbery.* The first of the three robberies occurred on March 28, 1979, when a man with a gun robbed the Cal-Ed Credit Union. Immediately after the robber left the scene, a call was made to Officer Charles Filoni of the California, Pennsylvania Police Department, stating that the robber had fled in a dark green pick-up truck. Filoni responded to the call and spotted a truck, matching this description, with a driver and one passenger. Filoni testified that he pursued the truck, and that, when his police cruiser was fifteen to twenty feet behind the truck, the passenger extended his upper body out of the window and pointed a semiautomatic pistol at him. Filoni ducked; the passenger fired; the bullet penetrated Filoni's windshield and lodged in the headrest. A fragment of the bullet pierced Filoni's left shoulder.

After Filoni had continued the chase for twenty-two miles, he lost and never regained sight of the truck. According to

---

1. A fourth co-defendant, John Sebetich, was indicted on charges of conspiracy, robbery of the Bentleyville bank, and jeopardizing the lives of the tellers in Bentleyville. He was acquitted on all counts.

2. Buhovecky contends that the evidence presented at trial to convict him on the conspiracy

charge was insufficient. The United States has conceded that this is so and consents to vacatur of the conspiracy conviction. The matter must be remanded for resentencing, because we cannot be sure that the sentence for the bank robbery counts was not influenced by the conviction on the conspiracy count.

Filoni, during the chase the passenger leaned out of the window approximately eight more times and fired four to five more shots. At trial, Filoni estimated that he had viewed the passenger for a total of forty-nine seconds at distances of about thirty to forty yards, and at speeds ranging from forty to seventy-five miles per hour. Immediately following the incident, Filoni described the passenger as having light brown thick wavy hair, long sideburns, a full but closely cropped beard, and a thin mustache.

The Cal-Ed robbers made good their escape, and the police and FBI remained without a suspect for approximately a year and a half. In September or October of 1980, Officer Filoni noticed a photograph on the bulletin board at the police station and spontaneously identified it as that of the man who had fired at him during the chase following the robbery. The photograph, which was of appellant Sebetich, showed a man without a beard or mustache and with dark, straight hair. It had been taken in 1971, about nine years before the robbery.

In December of 1980, Agent Scupien of the FBI showed Filoni a photo spread containing the picture of Sebetich that had been posted on the bulletin board. Filoni once again identified Sebetich as the Cal-Ed robber. He also identified, with some reservation, a picture of appellant Dean, referring to him as the driver of the green get-away truck. Over Sebetich's objections, evidence of Filoni's two out-of-court identifications was admitted at trial. Filoni also made an in-court identification of Sebetich as the passenger in the green truck who had fired at him. Additionally, Filoni testified concerning his out-of-court identification of Dean and made an in-court identification of Dean as the driver of the truck.

B. *The Bentleyville Robbery.* On May 17, 1979, two armed men robbed the Union National Bank in Bentleyville, Pennsylvania. After leaving the bank, they escaped in a yellow American Motors Gremlin that was parked in an alley across the street. A third accomplice, who had been waiting in the car, drove it about a mile and a half outside the business area of Bentleyville to the Chippewa Golf Course. There all three abandoned the Gremlin and continued their escape in a second getaway car driven by a fourth man.

On July 12 or 13, 1979, William Stankovich, Chief of the Bentleyville Police Department, was patrolling near appellant Buhovecky's residence when, according to Stankovich's trial testimony, Buhovecky approached him and asked how much money had been taken in the Bentleyville robbery. Stankovich told him the amount, and Buhovecky seemed surprised. Stankovich testified that on the 16th or 17th of the same month he encountered Buhovecky in the parking lot of the American Legion Post in Bentleyville, and that Buhovecky requested a meeting with the FBI or the state police to discuss possible immunity regarding his involvement with the Bentleyville robbery in exchange for his help in the investigation. Stankovich testified that Buhovecky then related in detail the events surrounding the robbery and admitted that he was the driver of the first getaway car.

Stankovich testified that he met with Buhovecky several more times to discuss the robbery and Buhovecky's possible immunity from prosecution and that during the course of these discussions, Buhovecky implicated appellants Sebetich and Dean in the Bentleyville robbery. Buhovecky also met with an FBI agent, Stankovich, and a representative of the state police to discuss the case, but no agreement concerning immunity was ever reached. Additionally David Daniels testified that Buhovecky had told him that the Bentleyville robbery was a "clean job" and that the "feds would never catch him."

Several persons also testified that Dean spoke of the robbery both before and after it occurred. David Daniels testified that on one occasion in April or May of 1979, while at his sister Cindy Williams' home, he overheard Dean admit to Williams' husband that he had a master plan to rob Bentleyville. Daniels testified that he then told

Cindy Williams what he had overheard, and that she listened to the rest of the conversation from the utility room of the house. Williams testified that she heard Dean tell her husband that he was going to rob the Bentleyville bank. Daniels further testified that in June or July, 1979, Dean told him that he had robbed the Bentleyville bank. Moreover, Charles Powers testified that Dean admitted that he robbed the Bentleyville bank and two others.

Margaret Wilks, Dean's stepmother-in-law, testified that she was the owner of a yellow Gremlin similar to that used in the Bentleyville escape. She testified that this car was stolen the night before the robbery, and that Dean was aware of the Wilks' family practice of leaving car keys in the automobile.

Finally, after denying Dean's pretrial motion to suppress, the court admitted into evidence at trial a pair of boots, obtained from a search of the Dean residence, that matched a pair of boots shown in a photograph taken during the Bentleyville Bank robbery.

C. *The Finleyville Robbery.* On August 27, 1979, a Chevrolet El Camino sped into the parking lot of the Finleyville office of Equibank. Two men wearing ski masks and carrying guns got out of the car and ran into the bank. One of the robbers, who was also wearing what a teller testified were "glasses with a nose on like you would wear at Halloween," vaulted over the counter and looted open cash drawers. In so doing, he left a sneaker print on a certificate lying on the counter; a surveillance camera photograph also showed that he was wearing sneakers.

During the search of Dean's house, *see supra*, the police confiscated a pair of sneakers matching those in the surveillance picture. In addition, an expert witness testified at trial for the prosecution that the shoe print on the certificate of deposit was made by the right sneaker found during the search of Dean's residence. The search also uncovered a pair of glasses and Groucho Marx-type nose mask; the government introduced the mask into evidence at trial,

contending that it was the mask worn by the robber who vaulted over the counter during the robbery.

The search of Dean's residence also yielded a number of state automobile inspection stickers. Edmund J. Sedney, owner of an automobile dealership in Charleroi, located some ten to twelve miles from Finleyville, testified that on the date of the Finleyville robbery, inspection stickers and a Chevrolet El Camino (the type of vehicle used in the robbery) were stolen from the dealership. The stickers were admitted into evidence at trial.

Appellants Sebetich, Buhovecky, and Dean each raise a number of issues on appeal, some of which are common to all the appeals. First, we shall address first the contentions of Sebetich, then those of Buhovecky and Dean, respectively. Finally, we shall discuss the issues raised in common by all three appellants. We shall recount additional facts relevant to the specific legal contentions when necessary.

## II. *ISSUES RAISED BY SEBETICH*

### A. *The Identification Procedures*

At trial, Officer Filoni was permitted to identify Sebetich as the man who shot at him from the pickup truck, and to testify that he had selected a photograph of Sebetich after examining a spread of five photographs some 18 months after the robbery. Sebetich challenges both portions of this testimony on due process grounds. He argues that the photo spread was suggestive because it contained the photograph that Filoni had earlier, albeit spontaneously, identified as that of his assailant. Sebetich further argues that this allegedly suggestive procedure tainted the in-court identification, and that no independent basis for that identification could exist in view of the circumstances surrounding Filoni's encounter with the pickup truck.

Evidence of an out-of-court identification comports with due process unless the taint of suggestiveness created "a very substantial likelihood of misidentification." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct.

375, 381, 34 L.Ed.2d 401 (1972). For the reasons that follow, we conclude that the out-of-court identification was not impermissibly suggestive and was properly admitted. The in-court identification could not therefore be suppressed.

As we have noted, the impetus for the photospread occurred some 18 months after the robbery, when Officer Filoni noticed a photograph posted on the wall in the police station. According to his testimony at the preliminary hearing, Filoni, upon seeing the photograph, immediately and spontaneously identified the man in the picture, appellant Sebetich, as his assailant.[3] Approximately two months after Filoni's spontaneous identification of the single photograph, Agent Scupien showed Filoni a spread of five photographs, including the photograph which Filoni had identified earlier. Once again, Filoni selected Sebetich's picture as that of the man who had shot him.

We reject Sebetich's contention that Filoni's initial viewing of the photograph tainted the later identification from the array of photos. There is no contention that, except for the complaint that the previously identified photograph of Sebetich was included, the spread was suggestive. An inspection of the spread confirms that it was a fair one containing men of similar age and appearance.[4] Filoni, faced with a number of similar photographs, might have qualified his earlier identification. At the session with Agent Scupien, however, Filoni reiterated his belief that Sebetich's photo was that of his assailant. Inasmuch as the

spread contained this photograph, it could be argued to the trier of fact that it has little independent probative value, but the second identification was not thereby tainted by the first. Nor was the photospread evidence flawed by any suggestive remarks by the law enforcement officer. Thus, evidence of the out of court identifications was properly admitted.

Because we conclude that the out-of-court identifications were not tainted, we perforce conclude that the in-court identification of Sebetich is admissible, for the only colorable (or asserted) basis for the claim that the in-court identification is inadmissible is the supposed suggestiveness of the out-of-court identification procedures.[5]

## B. *Exclusion of Expert Testimony as to the Reliability of Eyewitness Identification*

Five days before trial, Sebetich moved for permission to retain Dr. Robert Buckhout, a psychologist experienced in the subject of eyewitness identification, to testify as an expert witness concerning the anticipated identification testimony by Officer Filoni.[6] At argument on the motion, counsel for Sebetich emphasized the stressful conditions under which Filoni raced with the pickup truck and the 18-month lapse of time between the chase and Filoni's first identification of Sebetich, as circumstances about which Dr. Buckhout would testify. Although the identification testimony by Filoni was the crucial evidence in the government's case against

3. Within days after the robbery, Agent Scupien of the FBI had shown Filoni a spread of photographs which, according to the testimony of another FBI agent, did not contain a photograph of Sebetich. At that time, Filoni was unable to make a positive identification of his assailant, although he did state that some of the faces looked familiar.

4. Indeed, a photograph of Sebetich's brother John was included. We also note that there is no evidence that the police had any other photograph of appellant that they might have used.

5. Sebetich argues that the basis for Filoni's in-court testimony was so weak that its admission

violates his due process rights even if it was untainted by an impermissibly suggestive out-of-court identification. Based on our examination of the "totality of the circumstances," *Stovall v. Denno*, 388 U.S. 293 at 302, 87 S.Ct. 1967 at 1992, 18 L.Ed.2d 1199; *Manson v. Brathwaite*, 432 U.S. 98 at 113, 97 S.Ct. 2243 at 2252, 53 L.Ed.2d 140, we believe that Filoni's in-court identification testimony has enough "aspects of reliability," *id.*, at 112, 97 S.Ct. at 2252, which, absent the "corrupting effect of [a] suggestive identification," procedure, *id.*, at 114, 97 S.Ct. at 2253, satisfy due process.

6. This form of motion was necessary because Sebetich was represented by appointed counsel.

Sebetich, the district court denied the motion, stating that it did not "believe that this is such scientific, technical or specialized knowledge as would require the opinion of an expert." Fed.R.Evid. 702.[7]

At the time of its decision, the district court did not have available our opinion in *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985). In *Downing*, we held that Fed.R.Evid. 702 may permit a defendant to adduce testimony from an expert in the field of human perception and memory concerning the reliability of eyewitness identifications. We held further that the admission of this kind of expert testimony is not automatic, but must survive preliminary scrutiny by the district court. The test fashioned in *Downing* centers on two factors: (1) the reliability of the scientific principles upon which the expert testimony rests and hence the potential of the testimony to aid the jury in reaching an accurate resolution of the disputed issue; and (2) the likelihood that introduction of the testimony may overwhelm or mislead the jury. In addition, admission depends upon the "fit," *i.e.*, a specific proffer that the testimony will focus on particular characteristics of the eyewitness identification at issue and discuss how those characteristics call into question the reliability of the identification. Finally, we held that the district court retains discretionary authority under Fed.R.Evid. 403 to exclude evidence which, though relevant, would unduly waste time or confuse the issues at trial.[8]

The facts of this case illustrate the potential utility of testimony such as that proposed to be given by Dr. Buckhout.

Filoni testified that he saw the passenger in the pickup truck during a number of brief intervals amounting to only forty-nine seconds. These sightings occurred while Filoni was pursuing the truck at speeds of up to seventy-five miles an hour and while his life was threatened by gun fire. Indeed, the first shot from the truck entered Filoni's car and lodged in his headrest. After the third shot, Filoni allowed a distance of approximately 40 yards to open between the fleeing truck and his car.

Filoni thus saw his assailant under highly stressful circumstances. There is evidence that stress decreases the reliability of eyewitness identifications, contrary to common understanding. *Downing*, 753 F.2d at 1230. *See also United States v. Smith*, 736 F.2d 1103, 1105–06 (6th Cir. 1984); *People v. McDonald*, 37 Cal.3d 351, 361–62, 690 P.2d 709, 716, 208 Cal.Rptr. 236, 245 (1984); *State v. Chapple*, 135 Ariz. 281, 294, 660 P.2d 1208, 1221 (1983). According to the proffer, Dr. Buckhout would also have given evidence regarding the vagaries of identifications made long after an event. A similar proffer was part of the basis for our decision in *Downing*.[9]

Because the government's case against Sebetich rested exclusively on Filoni's identification, and the identification was subject to the challenges described, at the very least a preliminary *Downing* hearing should have been held. We will therefore vacate the judgment of conviction and remand the case for a hearing to determine the admissibility of the expert testimony according to standards set forth in *Downing*.[10] If the district court determines, in

---

**7.** The court also noted that the motion was filed "somewhat late," but the transcript of the oral argument on the motion reveals that the court's rationale for excluding the testimony lay with the nature of the proffered testimony, not with the tardiness of the motion.

**8.** Although *Downing* was decided after Sebetich's trial, we are obliged to decide this appeal according to the legal rules currently in effect. *See United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

**9.** Officer Filoni's spontaneous identification of Sebetich as his assailant came some 19 months

after the robbery. *Compare Chapple*, 135 Ariz. at 284, 660 P.2d at 1211 (expert testimony admitted where 14 months had elapsed between crime and photospread) *with Smith*, 736 F.2d at 1104, 1105 (error not to admit expert testimony where robbery and line-up were four months apart).

**10.** Because the crucial evidence against appellant consisted solely of Filoni's identification, we cannot conclude that the district court's decision to exclude Dr. Buckhout's testimony, if error, was harmless.

light of *Downing,* that the testimony is not admissible, it will reinstate the judgment of conviction. If the court determines that the proferred testimony is admissible, it must order a new trial as to Sebetich. *See Downing,* at 1243; *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 2217, 81 L.Ed.2d 31 (1984).

C. *The District Court's Refusal to Permit the Defendant's Proposed In-Court Identification Strategems*

■ Sebetich contends that the trial court erred in denying his motion to test Officer Filoni's in-court identification testimony by placing Sebetich in the courtroom audience or among certain persons resembling him at the counsel table, or by staging an in-court lineup. Our inquiry is whether the district court abused its discretion in denying these motions. *United States v. Edward,* 439 F.2d 150, 151 (3d Cir.1971).

■ Generally the reliability of eyewitness identification is a matter for the jury. *See Foster v. California,* 394 U.S. 440, 442 n. 2, 89 S.Ct. 1127, 1128 n. 2, 22 L.Ed.2d 402 (1969); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *United States v. Conway,* 415 F.2d 158, 164 n. 12 (3d Cir. 1969). Therefore a trial court has no obligation to stage a line-up. *See United States v. Archibald,* 734 F.2d 938, 941 (2d Cir.1984); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 755–56 (7th Cir.1976) (citing *United States v. Moss,* 410 F.2d 386, 387 (3d Cir.), *cert. denied,* 396 U.S. 993, 90 S.Ct. 488, 24 L.Ed.2d 455 (1969)). However, the Second Circuit has expressed concern over the possible suggestiveness of in-court identification procedures. *Archibald,* 734 F.2d at 941–42; *see also United States v. Brown,* 699 F.2d 585, 593–94 (2d Cir.1983); *Boyd v. Henderson,* 555 F.2d 56, 61–62 (2d Cir.1977); *Brathwaite v. Manson,* 527 F.2d 363, 367 n. 6 (2d Cir.1975), *rev'd on other grounds,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) ("indeed it would seem that only the apparent weakness of ... identification [where the defendant is sitting at the counsel table], along with its traditional character, saves it from condemnation as being itself impermissibly suggestive."). In *Archibald,* the Second Circuit stated that an in-court identification during which the defendant is seated next to defense counsel is "obviously suggestive to witnesses...." 734 F.2d at 941. Therefore, in exercising its discretion the court must ensure that an in-court identification is not merely a show-up. *Id.*

However, any suggestiveness inherent in Filoni's in-court identification of Sebetich was mitigated by the presence of his three co-defendants, who were seated in adjacent chairs. Certainly, the identification in this case was less suggestive than another that this court has permitted. In *United States v. Moss, supra,* we held that the in-court identification of the sole member of a race present in the courtroom is proper even where the court denied the defendant's motion to bring to the courtroom prison inmates of the same race, and where the defense was unable to procure other members of defendant's race to sit with him. 410 F.2d at 387. Moreover, there was no evidence that Sebetich "stood out physically from others in the courtroom." *United States v. Bush,* 749 F.2d 1227, 1232 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1771, 84 L.Ed.2d 831 (1985). The only suggestive circumstance identified by Sebetich is that he sat in front of the public, near the counsel table. This circumstance alone does not establish a violation of due process.

■ In view of the passage of five years between the robbery and the in-court identification, it might have been desirable for the district court to have allowed one of the strategems proposed by counsel for Sebetich. We recommend that these procedures be employed whenever necessary to ensure the accuracy and reliability of identifications. In most cases, they will not be unduly burdensome, and their potential benefits would, in appropriate cases, outweigh

any additional time or complexity at trial.[11] *See United States v. Archibald,* 756 F.2d 223, 223 (2d Cir.1984) (modifying earlier opinion in the case) (where the court fears an irreparably suggestive in-court identification, the court may stage an in-court lineup or employ any other procedure to ensure the accuracy of the identification.) *See also Brown,* 699 F.2d at 594. However, the decision to employ such procedures is within the discretion of the district court and we conclude that the district court did not abuse its discretion in denying the motion here.[12]

### III. *ISSUES RAISED BY BUHOVECKY*

A. *Admissibility of Statements Allegedly Made in Plea Bargain Negotiations*

■ Buhovecky contends that the court committed reversible error in admitting inculpatory statements that he made to Chief Stankovich, relying on Fed.R.Crim.P. 11(e)(6)(C) and (D), which prohibit the admission of statements made during the course of plea bargaining.[13] Buhovecky's contention is unsupported by the rule as amended in 1979. In pertinent part, the current version of the rule provides:

> Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:
>
> . . . .
>
> (D) *any statement made in the course of plea discussions with an attorney for the government* which do not

result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed.R.Crim.P. 11(e)(6) (emphasis added).

Prior to its amendment, the rule provided for the exclusion of "statements made in connection with, and relevant to, any of the foregoing pleas or offers." Fed.R.Crim.P. 11(e)(6) (1975). Some courts construed this rule liberally. *See United States v. Herman,* 544 F.2d 791 (5th Cir.1977) (holding inadmissible statements the defendant made to two postal inspectors while he was in custody, indicating that he would plea guilty to armed robbery if the murder charges were dropped.); *United States v. Brooks,* 536 F.2d 1137 (6th Cir.1976) (court refusing to admit defendant's telephoned offer to a postal inspector to plead guilty in exchange for a two-year maximum sentence.). *Contra United States v. Grant,* 622 F.2d 308, 313 (8th Cir.1980) ("[T]he *Herman* case extend the scope of [Rules 11 and 410] far beyond their intended boundaries." (footnote omitted)); *United States v. Stirling,* 571 F.2d 708, 731 (2d Cir.1978), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). The legislative history of the 1979 amendments manifests congressional disapproval of broad judicial constructions of the previous language, and the revision of the rule appears to have been designed specifically to avoid the *re*sult in *Herman* and other cases reaching similar results. H.Rep. 94–414 No. 414, 94th Cong., 1st Sess. 10 (1975), U.S.Code Cong. & Admin.News, 1975 pp. 674, 714.[14] The rule of is no help to Buhovecky for several reasons.

First, Buhovecky and Stankovich clearly did not intend to reach a plea bargain

---

**11.** In addition, such procedures must be fair to the government as well as to the defense. Thus it would be inappropriate to use these procedures where the defendant's appearance has been significantly altered.

**12.** Because we conclude that, with the possible exception of the Buckhout testimony, the district court committed no error at trial as to Sebetich, we reject Sebetich's claim that an accumulation of errors deprived him of due process.

**13.** Buhovecky also relies in this regard on Fed. R.Evid. 410 but because the rules are identical, we shall limit our discussion to Fed.R.Crim.P. 11(e)(6).

**14.** *See also,* J. Weinstein & M. Berger, *Weinstein's Federal Evidence,* ¶ 410[08] at 410–50–51 ("the Advisory Committee Note to the 1980 amendment . . . indicates that the statements in *Herman* would not be covered by the amended rule."). The authors were referring to Rule 410, which, as we have explained, is congruent with Rule 11(e)(6)(D).

agreement during these discussions. Buhovecky merely asked Stankovich to arrange a meeting at which such an agreement might be reached. *See Ceballos,* 706 F.2d at 1203 (incriminatory letter held admissible even though the writer had been arrested when he sent it because "no plea negotiations were [then] underway."). They could not have expected to come to terms during an unplanned encounter in the American Legion parking lot, during the investigatory stage of the robbery, J. Weinstein & M. Berger, *supra, Weinstein's Evidence,* ¶ 410[08] at 410–51 (1982), when Buhovecky had not even been charged with a crime. *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1148 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978). Nor could Buhovecky reasonably have believed that Stankovich had any authority to plea bargain, *see United States v. Karr,* 742 F.2d 493, 496 (9th Cir.1984), because Stankovich told Buhovecky that he lacked such authority. *See Rachlin,* 723 F.2d at 1376–77; *Ceballos,* 706 F.2d at 1203.

Moreover, Buhovecky's admissions to Stankovich do not fit within the amended rule. The statements were not "made in the course of plea discussions with an attorney for the government." Fed.R. Crim.P. 11(e)(6)(D). *A fortiori,* they cannot be said to have been made in the course of any proceedings under [Rule 11(e)(6)(C)], *id.*[15] In sum, because Buhovecky's inculpatory statements were not made during Rule 11 plea negotiations with an attorney for the government, the rule did not mandate their exclusion.[16]

## IV. ISSUES RAISED BY DEAN

### A. Search of the Dean Residence

On September 6, 1979, Officer Fleming of the Pennsylvania State Police, Chief Stankovich, FBI Agent Scupien, and several other officers conducted a search of the Dean residence. The search uncovered, *inter alia,* a Groucho Marx-type false nose and glasses, sneakers with imprints matching those left at the Finleyville bank, and boots resembling those worn by one of the Bentleyville robbers. The sneakers and boots were introduced into evidence against Dean at trial.

■ Prior to trial, Dean moved to suppress the fruits of the search, claiming that his mother Audrey Dean, who signed a consent form provided to her by Officer Fleming, did not voluntarily consent to the search. After a hearing, the district court denied the motion, stating, without elaboration, that Mrs. Dean's written consent was voluntary and that the oral consent also obtained from Dean at the time was likewise voluntary. Our discussion of the suppression issue will relate only to our disposition of Dean's appeal of the conviction for the Finleyville robbery. As to the Bentleyville robbery, we conclude that the other evidence introduced against Dean, *see* discussion *supra* at pp. 7–8, is so overwhelm-

**15.** A number of courts of appeals have held that the amendment to Rule 11 limits the exclusionary rule to *formal* plea discussions. *See Rachlin v. United States,* 723 F.2d 1373, 1377 (8th Cir. 1983) (statements held admissible because Assistant United States Attorney was not present during the meeting at which the statements were made, nor did he arrange the meeting.); *United States v. Ceballos,* 706 F.2d 1198, 1203 (11th Cir.1983) (letter in which defendant expressed awareness of details of smuggling operation admissible, *inter alia,* because letter was not addressed to an attorney for the government.) However, we need not reach that question here.

**16.** Buhovecky also asserts that the district court erred in failing to charge the jury, pursuant to 18 U.S.C. § 3501. However, since no genuine factual issue concerning the voluntariness of a confession was presented by the defendant at trial, such an instruction is not required. *United States v. Bondurant,* 689 F.2d 1246 (5th Cir. 1982); *United States v. Groce,* 682 F.2d 1359 (11th Cir.1982); *United States v. Houle,* 620 F.2d 164 (8th Cir.1980); *United States v. Fera,* 616 F.2d 590 (1st Cir.1980). Buhovecky also challenges the failure of the district court to exclude certain damaging testimony against him under Fed.R.Evid. 403. Buhovecky fails to appreciate that it is only unfair prejudice that is the basis for a Rule 403 balancing. His argument is without merit. Finally, Buhovecky challenges the sufficiency of the evidence to support his conviction for robbing the Bentleyville bank, but that argument is plainly without merit also.

ing that the presentation to the jury of evidence that Dean's boots were similar to the boots shown in the surveillance photograph was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[17]

█ Officer Fleming, the government's principal witness on the suppression issue, testified that, as part of an investigation he was conducting into several house burglaries in the Washington County area, he obtained from a Washington County District Justice a search warrant covering the Dean residence.[18] Along with Chief Stankovich, Agent Scupien, and three other officers, Fleming proceeded to the Dean home.

In response to Fleming's knock, Mrs. Dean answered the door. According to Fleming, he advised Mrs. Dean that he was investigating a number of local burglaries and requested that she give him consent to search the house. He testified that he did not mention the warrant, in accordance with his usual practice of attempting first to obtain consent for a search and only if unsuccessful, executing the warrant. However, when Mrs. Dean asked Stankovich whether the officers could search the house if she did not sign the consent, Stankovich replied that they could obtain a search warrant.[19] Fleming further stated that Mrs. Dean inquired of Chief Stankovich—whom Mrs. Dean evidently knew and to whom she referred at one point as "Willie"—whether "things would go better" for her son if she signed the form; Fleming's recollection of Stankovich's answer to this question is not on the record. He testified only that "she ... asked Chief Stankovich as to whether or not—whether or not it would be better if she sign the voluntary

consent, and then she went along and signed it."

Although appellant Earl Dean was not present at first, Officer Fleming stated that he requested that Mrs. Dean call him to come downstairs. According to Fleming, she called and Dean came. At that point, Officer Fleming read the contents of a voluntary consent form aloud to Mrs. Dean. Fleming testified that Mrs. Dean signed the form, stating that she had "nothing to hide." He further stated that Earl Dean was present when the consent form was read and signed, and that he gave oral consent for the search.

Mrs. Dean told quite a different story, as the following excerpt of her testimony demonstrates:

Q When [the officers] came to your door and you asked—you invited them in, what did they say?

A They wanted to see my older son.

Q That's Earl Dean?

A That's Earl.

Q Did they say anything else to you?

A They said they wanted to search the house.

Q And what was your response?

A I asked them why, and then they—and then I asked them if—he said he had a search warrant. He did say he had a search warrant.

I says, "Can you search if I don't sign?" And he said yes. Then I asked him if I signed, would it be better; and he said "Yes, it will go easier on your son."

Q Who was saying this?

A Mr. Fleming, I don't know his rank.

Q He told you he had a search warrant?

---

**17.** *A fortiori,* the introduction was harmless as to the conspiracy count. In view of the potential collateral consequence of a second substantive bank robbery conviction, however, we do not apply the concurrent sentence doctrine. *See United States v. Lampley,* 573 F.2d 783, 788, 796–93 (3d Cir.1978).

**18.** Counsel for Dean conceded at oral argument that the evidence uncovered at the Dean resi-

dence was within the scope of the warrant. We therefore need not discuss the particulars of the warrant, although the question whether there existed probable cause to support the issuance of the warrant may be relevant on remand.

**19.** Under cross-examination, Fleming stated "At one point we advised her that we could obtain a search warrant *if needed.*"

A He said he could—he said, "I have a search warrant. I can search if you don't sign."

Tr. of Pretrial Hearing at 240–241 (*reprinted in* Dean Appendix at 90a–91a). Mrs. Dean also testified that at the time she signed the consent form, she was "not rational. . . . really totally wiped out." She denied that she read the consent form before she signed it, or that it was read to her. She further testified that her son Earl was not present with her and the police until she called him from the upstairs of the house, and that that was after she had signed the form.

■■■■ If either Audrey Dean or Earl Dean consented to Officer Fleming's search of the premises, the district court correctly denied the motion to suppress the fruits of the search. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The government must prove, by a preponderance of the evidence, that consent was voluntary in light of the surrounding circumstances. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047. The record contained evidence which, if credited by the district court, would support a finding of voluntariness. In many cases, a conclusory finding of consent by the district court would be sufficient to allow appellate review of the issue of whether a person voluntarily consented to a search, *cf. United States v. Compton*, 704 F.2d 739, 741–42 (5th Cir. 1983) (where district court made no specific findings on voluntariness of consent, court of appeals reviewed record to determine whether denial of motion to suppress was clearly erroneous). However, in this case there are at least two critical unresolved factual issues that prevent us from properly reviewing the district court's finding.

The first concerns Mrs. Dean's testimony that Fleming told her that he *had* a warrant. Since the district court never discredited this testimony, we cannot be sure whether the district court's conclusory finding of consent was informed by an acknowledgement that, under *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct.

1788, 1791, 20 L.Ed.2d 797 (1968), a "consent" that followed a representation that the police officer had a warrant might be invalid.

In *Bumper*, the defendant's grandmother allowed the police to search her house after an officer announced "I have a warrant to search your house." At the suppression hearing, the government declined to rely on a warrant, which apparently had been issued, to justify the search. The Supreme Court held that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion, there cannot be consent." *Id.* at 550, 88 S.Ct. at 1792. The Court further stated that the conclusion would be the same if the warrant were invalid, if there were in fact no warrant at all, or if the government did not attempt to rely on the warrant. *Id.* at 549, 88 S.Ct. at 1792.

*Bumper* does not establish a blanket rule that, whenever police possess an invalid search warrant or falsely claim that they can obtain one, voluntariness is necessarily vitiated; indeed *Schneckloth* mandates consideration of all the surrounding circumstances. In a situation like that in *Bumper*, however, the government bears an especially heavy burden, as this court noted in *United States v. Molt*, 589 F.2d 1247, 1251–52 (3d Cir.1978):

When evidence exists to show . . .—that a defendant believed he must consent—such evidence weighs heavily against a finding that consent was voluntarily given. And when that belief stems directly from misrepresentations by government agents, however innocently made, we deem the consent even more questionable.

We note that it is quite possible that the consent at issue here was not at all tainted by the sort of government misrepresentation condemned in *Bumper* and *Molt*. In this case, unlike those, the law enforcement officials *had* a warrant. If indeed that

warrant was supported by probable cause, even a statement by Officer Fleming that he could obtain, not merely attempt to obtain, a warrant, *see* discussion *infra,* would stand on a different footing. In these circumstances, the representation would not constitute deceit or trickery, but only "a fair and sensible appraisal of the realities" facing Dean and his mother. *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974).

Another area of concern that is muddied by the lack of specific findings is that framed by Fleming's testimony that he informed Mrs. Dean that he could obtain a search warrant if she refused to give consent. To the extent that some versions of this statement suggest that acquiring the warrant would be a foregone conclusion, they might have conveyed to Mrs. Dean and Earl Dean the impression that they had no choice but to consent. On the other hand, if the district court found that Fleming clearly indicated to Mrs. Dean that, absent consent, he would only *seek* to obtain a warrant, and that a magistrate would first have to determine that probable cause existed, such a finding would not militate at all against a finding of voluntary consent. *See e.g., United States v. White,* 617 F.2d 1131 (5th Cir.1980) (consent upheld where agent said that if he failed to gain consent he would have to demonstrate probable cause to search before a magistrate); *United States v. Miller,* 589 F.2d 1117, 1132 n. 13 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (consent not involuntary where officer asserted that if defendant did not consent to the search of his luggage he would seek a warrant). Again, the district court made no specific finding, and without knowing which portions of Fleming's testimony the district court chose to credit, we cannot assess the coercive impact, if any, of those statements. *See United States v. Sanchez,* 635 F.2d 47, 61 (2d Cir.1980).

In view of the lack of specific findings we cannot say with assurance that the search was not unlawful.[20] We will therefore vacate Dean's conviction with respect to the Finileyville robbery and remand for further proceedings, at which time the issues addressed herein can be explored.[21] The court may wish to conduct a further hearing, or simply make more explicit findings as to who said what to whom, as to the validity of the warrant, et alia.[22] If the motion to suppress is granted, the district court will consider what further relief is in order. If it is denied, it will reinstate the conviction.

## V. JOINT ISSUES

### A. Sufficiency of the Indictment

Each of the appellants argues that the substantive bank robbery counts of the indictment against them should be dismissed because they fail to state an essential element of the offenses, namely, that the Cal-Ed Federal Credit Union was insured by the National Credit Union Administration. The indictment states only that the defendants robbed the "Cal-Ed Federal Credit Union," in violation of 18 U.S.C. § 2113(a)." That section proscribes the robbery of "any bank, credit union, or any

---

**20.** Nor can we say that the admission of the fruits of the search, which provided critical evidence against Dean, was harmless beyond a reasonable doubt with respect to the Finileyville robbery, where the evidence was not as strong as it was with respect to the Bentleyville robbery.

**21.** Another troubling factual issue is the alleged conversation between Mrs. Dean and Chief Stankovich. A statement by Stankovich to Mrs. Dean that "it will go easier on your son" if she consented to the search would not appear to be well-founded and would militate against a finding of consent. On the other hand, Mrs. Dean acknowledged that it was she who brought up the issue, a factor suggesting her willingness. The district court will doubtless wish to make explicit findings concerning what was said in this regard, and its significance in the totality of the circumstances.

**22.** If the district court finds that the warrant was valid and that the scope of the consent search did not exceed the scope of the warrant, the court may not have to consider whether the consent was coerced. *See Bumper v. North Carolina,* 391 U.S. 543, 553, 88 S.Ct. 1788, 1794, 20 L.Ed.2d 797 (Harlan, J., concurring); *id.* at 562, 88 S.Ct. at 1798 (White J., dissenting).

savings and loan association." 18 U.S.C. § 2113(a). "Credit union" is defined as "any Federal credit union and any State-chartered credit union the accounts of which are insured by the Administrator of the National Credit Union Administration." 18 U.S.C. § 2113(h). Section 2 of the Federal Credit Union, Pub.L. 91–468, 84 Stat. 994, 1015, *codified at* 12 U.S.C. § 1752, defines a "Federal Credit Union" as, essentially, a federally chartered credit union. Federal insurance of deposits in federal credit unions is discussed at 12 U.S.C. §§ 1781–90. While the indictment refers only to the statute, it includes a description of the victim institution as a "federal" credit union; moreover, the proof at trial established that the deposits of the credit union were indeed federally insured.

The parties have argued this issue on the assumption that federal insurance of deposits is necessarily an essential element of the crime under §§ 2113(a) and (h), but this assumption appears to be mistaken. The language of the statute clearly grants federal jurisdiction over robberies of *all* Federal credit unions and over those State credit unions whose deposits are federally insured. The fact that, as a rule, a Federal credit union will also be a federally-insured one, does not undermine the conclusion that § 2113 contains these two independent bases for jurisdiction. *See United v. Coleman,* 656 F.2d 509 (9th Cir.1981) (reaching same conclusion.) [23]

Appellants do not contend that they received inadequate notice of the crime charged, nor that an essential element of the charge—federal jurisdiction—was not established. In these circumstances, the indictment, which alleges that Cal-Ed was a federal credit union, was sufficient. Alternatively, the indictment's failure to allege federal insurance explicitly is at worst a technical deficiency. Although it might have been preferable for the indictment to have been more explicit on this point, it denied appellants none of the important protections of the indictment process.

An indictment provides satisfactory protection if it fairly informs the defendant of the charge against him and enables him to plead acquittal or conviction in bar of future prosecutions for the same offense. *United States v. Schoenhut,* 576 F.2d 1010, 1021–22 (3d Cir.1978). *See also Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). The indictment against appellants satisfies both parts of this test. The offense was unquestionably described carefully enough to alert the defendants of the charge against him and to bar subsequent prosecution for the same act. It specifically stated what they were alleged to have done, and when, where and how they were alleged to have done it. *See United States v. Coleman,* 656 F.2d 509 (9th Cir.1981) (holding valid an indictment charging robbery of a savings and loan association under § 2113(a) even though the indictment failed to allege insurance by the FSLIC); *United States v. Jones,* 327 F.Supp. 1208 (W.D.Pa.1971) (indictment is valid even though it was not alleged that the stolen funds were insured by the FDIC). We therefore reject appellants' claim that the substantive bank robbery counts of the indictment must be dismissed because they fail to state an essential element of the offenses.

**B. *Severance***

 Appellants Buhovecky and Dean each contend that the court erred in denying their motions for severance, asserting that the failure to sever created an evidentiary spillover that prejudiced his case.

---

**23.** It also appears that the indictment implicitly alleges that the Cal-Ed Federal Credit Union was federally insured. Although a credit union may retain federal status while being without federal insurance for up to one year, it is obvious that this is only an incidental exception to the general rule that Federal credit unions must be federally insured. 12 U.S.C. §§ 1771–1775. Indeed, the House Report states flatly that "Federal Credit unions are required to be insured under the act." H.R.Rep. No. 91–1457, 91st Cong., 2d Sess. 4, *reprinted in* 1970 *U.S.Code Cong. & Ad.News,* 4166, 4169. The exception seems to be meant only to give credit unions whose applications for insurance have been rejected the opportunity to reapply. The words "federal credit union" are thus essentially coterminous with the fact of federal insurance.

*See* Fed.R.Crim.P. 14. Buhovecky argues that his case was prejudiced because shots were fired during the Cal-Ed and Finleyville robberies for which he was not indicted, but none were fired during the Bentleyville robbery for which he was indicted. Dean contends that his defense of the Bentleyville robbery was prejudiced because defendants Buhovecky and John Sebetich made statements to Chief Stankovich implicating themselves in that crime. We hold that the district court did not err in denying the motions to sever because the appellants failed to carry their burden of showing prejudice to their cases.

■■■■ The trial judge is in the best position to balance the possible prejudice to a defendant of a joint trial against the concerns of judicial economy. *United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981); *see United States v. Thomas,* 610 F.2d 1166, 1170 (3d Cir.1979). Therefore, an appellant must meet a particularly heavy burden to show that the trial court abused its discretion in denying a motion to sever. *Reicherter,* 647 F.2d at 400; *United States v. Boyd,* 595 F.2d 120, 125 (3d Cir.1978); *United States v. Rickey,* 457 F.2d 1027, 1030 (3rd Cir.), *cert. denied,* 409 U.S. 863, 93 S.Ct. 153 34 L.Ed.2d 110 (1972). The appellant must present more than mere allegations; he must demonstrate that there is a clear and substantial prejudice which resulted in an unfair trial. *Reicherter,* 647 F.2d at 400; *United States v. Segal,* 534 F.2d 578, 583 (3d Cir.1976).

■■■■ The appellants' burden of showing prejudice is particularly onerous in this case. Generally, defendants such as Buhovecky and Dean, who are jointly indicted, should be jointly tried. *United States v. Simmons,* 679 F.2d 1042 (3d Cir.1982), *cert. denied,* 462 U.S. 1134, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983). Additionally, judicial economy ordinarily requires that defendants charged with a single conspiracy be tried together. *United States v. Dickens,* 695 F.2d 765, 778–79 (3d Cir.1983), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983); *United States v. Jackson,* 649 F.2d 967, 973 (3d Cir.1981).

There is no evidence that the court's failure to sever actually prejudiced either defendant. In determining whether there is prejudice the court must consider " 'whether the jury can reasonably be expected to compartmentalize the evidence.' .... *United States v. DeLarosa,* 450 F.2d 1057, 1065 (3d Cir.1971), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 ... (1972), *quoted in ... Boyd,* ... 595 F.2d at 125." *Reicherter,* 647 F.2d at 400. The jury in this case should have been able to compartmentalize the evidence against each defendant. The robberies occurred in March, May and August, 1979. These time differences would aid the jury in compartmentalizing the evidence. *See United States v. Dansker,* 537 F.2d 40, 62 (3d Cir.1976). Moreover, the fact that the jury acquitted John Sebetich of all counts, Dean of the Cal-Ed counts, and Franklin Sebetich of the conspiracy, Bentleyville, and Finleyville counts, indicates that it "was able to distinguish among the defendants in light of the evidence presented as to each." *Simmons,* 679 F.2d at 1050–51.

Finally, "[n]either a disparity in evidence nor the introduction of evidence more damaging to one defendant than another entitles the seemingly less culpable defendant to severance.... *Simmons,* 679 F.2d [at 1050]; ... *DeLarosa,* 450 F.2d at 1065]." *Dickens,* 695 F.2d at 779. The disparity to which Buhovecky points, that no shot was fired during the Bentleyville robbery for which he was indicted while shots were fired during the other robberies, is therefore unavailing to him. Similarly without merit is Dean's contention that his defense was prejudiced because the government's case against John Sebetich and Buhovecky was very strong by virtue of their admissions to those crimes. In fact, John Sebetich was acquitted of the Bentleyville robbery. Moreover, Dean has not challenged the sufficiency of the evidence to support his conviction.

C. *Admissibility of Testimony Concerning the Statements of Chester Sala*

■■■■ Each of the appellants has advanced the argument that one Chester Sala

had committed the crimes of which they stood accused. They proffered the testimony of Agnes Williams and her son Leslie, that Sala, who had been the boyfriend of Agnes Williams' daughter Kathy, had stated that he intended to rob the Cal-Ed Credit Union, and the Finleyville and Bentleyville banks. The district court sustained the prosecutor's objection to the proffered evidence on the ground that it was inadmissible hearsay. It did, however, allow one member of the Williams family to testify that the driver of the green pickup truck on the day of the Cal-Ed robbery looked like Sala, and that she had seen Sala hiding in the bushes in the vicinity of the robbery shortly after the police chase. The court agreed to issue a writ of habeas corpus *ad testificandum* to enable the defendants to produce Sala, then an inmate at the Rockview (Pa.) State Correctional Institution, for examination concerning his role in the robberies, but stated that it would forbid impeachment of Sala through the introduction of the Williams' testimony regarding his alleged statements. The defendants then elected not to call him.

Appellants contend that the district court erred in not permitting the statements to come in under Fed.R.Evid. 803(3) which provides for the admissibility as an exception to the hearsay rule of statements of the "declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design ...)."[24] *See Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); Advisory Committee Notes on Proposed Rule 803(3); McCormick on Evidence § 271 at 577–78. We agree that evidence of the statements, which would have corroborated earlier evidence linking Sala to the crime, should have been admitted. The erroneous exclusion of the statements was harmless, however. There is no reason to believe that the inference suggested by the statements—namely, that Sala was also involved in the robberies— would have altered the outcome of their trials. Sala might have been the second robber at Finleyville, the fourth at Bentleyville, or the driver of the getaway car at Cal-Ed. Establishing Sala's complicity in these robberies would in no way establish the innocence of any of the appellants. Moreover, as the district court noted, evidence did come in linking Sala to the Cal-Ed robbery. The exclusion of further evidence linking Sala to these crimes did not prejudice defendants.[25]

■ Finally, appellants object to the district court's ruling under Fed.R.Evid. 607, that they would not be permitted to impeach Sala by the testimony from the Williams. Assuming that they have standing to raise this issue even though they decided not to call Sala, *cf. Luce v. United States*, — U.S. —, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) ("[To] raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify"), the district court was correct to rule that, if Sala testified, his testimony could not be impeached by the Williams' testimony, for when appellants moved to subpoena Chester Sala, they did so with the expectation that he would deny making such statements to the Williams. The express purpose for calling Sala was thus to impeach him with the Williams' testimony, thereby providing the

**24.** It is possible that the statements were initially admissible under Fed.R.Evid. 804(b)(3) which makes "statements against interest" an exception to the hearsay rule. Under 804(b)(3) Sala's admissions could have come in if they "so far tended to subject him to civil or criminal liability ... that a reasonable man would not have made the statement unless he believed it to be true." Sala is alleged only to have said that he was contemplating the robberies, not that he had committed them. Moreover, his statement were, for the most part, quite general. But even assuming *arguendo* that the statements qualified for admission under 804(b)(3), once the district court agreed to issue a writ of habeas corpus *ad testificandum* to secure Sala's presence, the unavailability requirement of Rule 804 was no longer met.

**25.** If, of course, a new trial is claimed by the district court after the hearing on remand, it will consider our comments as to the admissibility of Sala's statements under Fed.R.Evid. 803(3) within the context of the evidence adduced on retrial.

jury with the details and substance of Sala's alleged prior inconsistent statements. It is well established, however, that witnesses may not be called for the purposes of circumventing the hearsay rule by means of Rule 607. *See United States v. Webster,* 734 F.2d 1191 (7th Cir.1984). *See also United States v. Miller,* 664 F.2d 94, 97 (5th Cir.1981), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106; *United States v. DeLillo,* 620 F.2d 939, 946 (2d Cir.1980); *Whitehurst v. Wright,* 592 F.2d 834, 839 (5th Cir.1979); *United States v. Rogers,* 549 F.2d 490, 497 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 33 L.Ed.2d 229 (1977); United States v. Morlang, 531 F.2d 183, 190 (4th Cir.1975).

### D. *Pre-Indictment Delay*

■ The robberies of the Cal-Ed, Bentleyville and Finleyville Banks occurred in 1979 on March 28, May 17 and August 27, respectively. It was not until March 23, 1984, five days before the statute of limitations expired on the Cal-Ed offense, that appellants were indicted. Each appellant moved to dismiss the charges, contending that his defense was unconstitutionally prejudiced by the prosecutorial delay. Specifically, they argued that the government's failure to commence prosecution earlier violated their rights to due process of law and to a speedy trial as secured by the Fifth and Sixth Amendments of the United States Constitution.

According to the testimony of FBI agent Garrity, there was sufficient evidence to obtain the indictment by February 4, 1982, when the FBI closed its investigation. Apparently due to confusion as to whether the state or federal government would prosecute the case, however, it "just sort of fell between the chairs." The investigation was reopened in March, 1983. Appellants argue that the delay prejudiced them for two reasons: the interim deaths of potential witnesses and the effect on the memories of actual defense witnesses.

Sebetich argues that the death of his father on March 14, 1984, deprived him of an important witness. William J. Stepanek of the Public Defenders Office testified that his investigation revealed that on the day of the Cal-Ed robbery, Sebetich was helping his father clean a drain in his father's house. Obviously Sebetich's father was unavailable to substantiate this putative alibi.[26] Similarly, Buhovecky alleges that an interim death prejudiced his Bentleyville defense insofar as appellant Sebetich's mother testified that on the date of the Bentleyville robbery, Buhovecky, George Susick, her son John Sebetich and her brother-in-law John Sebetich had a discussion on the brother-in-law's porch. She could not recall what time during the day that discussion occurred, nor who told her about the discussion. Susick died on January 2, 1982 (prior to the conclusion of the FBI's investigation) and the brother-in-law died on July 31, 1982.

Dean did not present evidence of specific witnesses who could not testify as a result of the delay. Rather, he stated in his motion to dismiss that the delay gave the government a tactical advantage over him by forcing him to recall events that had occurred almost five years earlier. Similarly, Sebetich and Buhovecky argued that the delay prevented witnesses from remembering exculpatory evidence. Mary Hewitt recalled the time Sebetich helped his father, but could not remember when it occurred; as discussed above, Sebetich's mother could not remember important information involving Buhovecky's alibi with respect to the Bentleyville robbery.

■ The speedy trial guarantee of the Sixth Amendment does not apply to pre-indictment delay. *United States v. Lovasco,* 431 U.S. 783, 788, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). The statute of limitations is a defendant's "primary guarantee against bringing overly stale criminal

---

**26.** George and Gary Hewitt were allegedly present when Sebetich helped his father, but they died on June 15, 1981; their availability at trial cannot be blamed on prosecutorial delay, as they died prior to the conclusion of the FBI investigation.

charges." *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, quoting *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). The appellants in the instant case were indicted within the applicable limitations period. However, the Due Process Clause of the Fifth Amendment protects defendants against oppressive pre-indictment delay within the applicable limitations period. *United States v. Marion, supra.* 404 U.S. at 324, 92 S.Ct. at 465. To invoke the extreme sanction of dismissal of the indictments under the Due Process Clause, the defendants must prove "that the government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense." *United States v. Gouveia*, 467 U.S. 180, 104 S.Ct. 2292, 2300, 81 L.Ed.2d 146 (1984); *United States v. Lovasco, supra,* 431 U.S. at 789–90, 97 S.Ct. at 2048; *United States v. Marion, supra,* 404 U.S., at 324, 92 S.Ct., at 465.

Appellants have not demonstrated prosecutorial bad faith. As in *United States v. Lindstrom*, 698 F.2d 1154, 1158 (11th Cir. 1983), they "have produced no evidence tending to suggest that the delay was a deliberate tactical maneuver by the government. "The delay in the instant case was the result of a mix-up between federal and state authorities. Upon discovering that the case was not proceeding, the prosecuting arm of the federal government reopened its investigation of the case and returned the indictment within six months. Accordingly, we hold that the district court properly denied appellants' motions to dismiss the indictments on the grounds of pre-indictment delay because the appellants have failed to establish that the delay was designed by the government to give some tactical advantage over appellants.

Appellants must show intentional delay *and* actual prejudice. Because they clearly failed to show intentional delay, we need not reach the question whether appellants have met the burden of showing actual prejudice. We remark only that we have serious doubts as to whether the allegations of prejudice were specific enough to constitute a showing of actual prejudice. Certainly the contentions that the memories of witnesses faded as a result of the delay falls short of the requisite showing of actual prejudice, *United States v. Marion,* 404 U.S. 307, 325–26 (1971), as do allegations that witnesses would have provided an alibi that are not targeted quite specifically to the time and location of the alleged offense.

## VI. CONCLUSION

For the foregoing reasons, we will vacate the judgment of conviction against Sebetich on counts II and III relating to the Cal-Ed robbery and remand, so the district court may conduct further proceedings consistent with this opinion. We will affirm the conviction of Buhovecky with respect to the Bentleyville robbery (counts IV and V) and the conviction of Dean on counts IV and V relating to the Bentleyville robbery and on the conspiracy count (count I). However, we will vacate the conviction of Dean on charges stemming from the Finleyville robbery (counts VI and VII) and remand to the district court for further proceedings consistent with this opinion. Moreover, we will reverse Buhovecky's conviction for conspiracy (count I), instruct the district court to enter a judgment of acquittal with respect to that count and will remand for resentencing on the remaining robbery counts.