UNITED STATES of America

v.

Richard McNAUGHTON.

Crim. A. No. 93–147(–10).

United States District Court,
E.D. Pennsylvania.

April 4, 1994.

Robert E. Welsh, Jr., Philadelphia, PA, for defendant.

Mary E. Crawley, Robert E. Courtney, Asst. U.S. Attys., Philadelphia, PA, for plaintiff.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Richard McNaughton is one of eighteen defendants named in a ninety-seven count indictment that alleges the existence of a conspiracy to evade state and federal excise taxes on the sale of diesel oil. The issue before me is whether to suppress statements McNaughton made to federal agents during interviews on November 24, and December 1, 1992. In arriving at my decision I must decide:

1. Whether a suspect is "in custody" when he is interviewed alone by government agents but is not handcuffed, patted down, placed under arrest, or otherwise physically restrained, and is permitted to receive telephone calls and to leave to speak with an attorney when he asks to do so. I hold that he is not.

2. Whether statements made in response to a government agent's invitation to cooperate, but in the absence of any promises of leniency or confidentiality, are inadmissible as involuntary. I hold that such statements are voluntary and admissible.

3. Whether statements made in response to an agent's invitation to cooperate, but in the absence of any promises or discussions of reduced charges or specific sentences, are inadmissible as having been made in the course of plea negotiations. I hold

that such statements are not suppressible on that basis.

4. Whether a defendant, who in his capacity as a corporate officer was represented by the company's corporate attorney, may obtain suppression of statements he made to a government agent who spoke to the defendant himself rather than to the company's attorney. I hold that the statements should not be suppressed. In deciding this I must determine:

(a) if a government agent is subject to the anti-communication rule to the same extent as the government's attorney. I find that he is.

(b) if representation by the corporate attorney is representation of the defendant in his individual capacity. I find that it is not.

(c) if a defendant is entitled to invoke the protection of the anti-communication rule in this circumstance. I find that he is not.

(d) if I were to find that the attorney-client relationship had been violated, whether suppression is an appropriate remedy for an ethics violation. I find that it is not.

## FINDINGS OF FACT

### As to statements made November 24, 1992:

1. Defendant McNaughton is the Manager of Wholesale Fuel Sales for Atlantic Oil and Heat ("Atlantic") and the president of Bell Fuels, Inc., trading as ASCO, Inc. McNaughton holds no ownership interest in either company.

2. On November 24, 1992, a search warrant was executed at the offices of Atlantic, located in Macungie, Pennsylvania. The search began at approximately 9:00 a.m. and continued until approximately 7:00 p.m.

3. Two agents, FBI Agent William Sinopole and IRS Agent William Ranmal, entered the offices of Atlantic through the main entrance at approximately 9:00 a.m. Agent Sinopole announced in a loud voice that everyone was to stop work and leave their work stations, that the agents were there to execute a search warrant and that the employees were free to stay or go, as long as they

did not work or interfere with the search, but that the agents wanted to identify people before they left. After this announcement the remaining agents entered the building.

4. Nineteen agents of the Federal Bureau of Investigation ("FBI"), Internal Revenue Service ("IRS") and Pennsylvania Department of Revenue, Bureau of Motor Fuel Taxes conducted the search. They were assisted later in the day by five additional IRS agents. The agents were armed and were wearing "raid" jackets (nylon windbreaker jackets saying FBI, CID or POLICE across the back). The agents did not draw their guns at any time during the search.

5. Approximately twenty-eight employees of Atlantic, including McNaughton, were on the premises when the search of Atlantic began.

6. McNaughton was interviewed by FBI Agent Ralph Hilborn and John Brennan, a Pennsylvania Revenue Enforcement Officer, in his office during the execution of the search warrant. McNaughton was not placed under arrest, patted down, handcuffed, or otherwise physically restrained. McNaughton was free to leave at all times.

7. Agent Hilborn advised McNaughton that the agents were there to execute a search warrant, told him what records they were searching for, and asked for his cooperation in locating any records within his office.

8. Agent Hilborn also explained to McNaughton that there was a significant amount of evidence against him, that it was likely that he was going to be prosecuted, that cooperation can be considered by the court at the time of sentencing under the Sentencing Guidelines, asked for his cooperation, and asked to interview him. He did not advise McNaughton of his *Miranda* rights.

9. Richard McNaughton agreed to be interviewed on November 24, 1992. The interview lasted from approximately 9:05 a.m. to 10:36 a.m.

10. At some point during the interview Agent Hilborn or Agent Brennan pushed the door of McNaughton's office closed or nearly closed; the agent took no action to lock the door. When shut, the door automatically locked so that no one could enter the office, although people in the office could still leave.

11. Agent Hilborn did not tell McNaughton that the interview would be "off the record", nor did he made any promises to Richard McNaughton regarding charges or sentencing. In fact, Hilborn specifically told McNaughton that he was not authorized to make promises of any kind to him.

12. Hilborn and McNaughton did not discuss the possibility of a guilty plea.

13. During the interview, McNaughton did not try to use the telephone to make any calls, nor did he ask the agents if he could do so. McNaughton received several calls during the interview. The agents asked some of the callers to call back at a later time; McNaughton spoke to other callers.

14. During the interview Agent Hilborn told McNaughton that Agent Perry would also like to interview him and would be getting in touch with him.

15. Attorney Thomas Smida is associated with the firm of Weaver, Mosebach, Piosa, Hixson & Marles of Allentown, Pennsylvania, and has experience in the area of criminal tax law. Attorney Smida received a telephone call on November 24, 1992 from Attorney Hauff, corporate counsel for Atlantic and Bell/Asco, and thereafter came to the offices of Atlantic, arriving at approximately 10:30 a.m.

16. Upon his arrival at Atlantic, Attorney Smida met with Bruce Ebert, one of the owners of Atlantic; Ebert asked Smida to represent the company and Ebert in connection with the execution of the search warrant that day.

17. McNaughton left the agents in his office at approximately 10:36 a.m. to speak with Attorney Smida. He was not restrained from leaving in any way. This was the first time that McNaughton had expressed to the agents any desire to leave his office.

18. McNaughton returned to his office at approximately 11:17 a.m. and told the agents that Attorney Smida did not want him to make any more statements. When questioned by Agent Hilborn regarding the status of Attorney Smida, Richard McNaughton

stated, "I work for Bruce Ebert. His attorney told me not to give a statement." The agents did not question McNaughton again that day without Smida present.

19. Attorney Smida was present from 11:40 a.m. to 11:47 a.m. when Agent Hilborn elicited personal background information from McNaughton. Attorney Smida stopped the interview when Revenue Enforcement Agent John Brennan asked about McNaughton's tax returns.

20. Attorney Smida was also present from 12:05 p.m. to 12:20 p.m. when McNaughton's briefcase was searched. At that time McNaughton discussed with the agents which personal items he would keep from his briefcase.

21. When Agent Hilborn spoke with Attorney Smida, Smida indicated that he was the "company" attorney. He did not tell the agents that he represented Richard McNaughton.

22. At no time on November 24, 1992 did McNaughton ever say to the agents that Attorney Smida represented him personally.

23. McNaughton left the offices of Atlantic in the early afternoon. As McNaughton was leaving the offices of Atlantic, Agent Hilborn shook his hand, reminded him that Agent Perry wanted to interview him and stated, "We'll be in touch".

24. At the conclusion of the search on November 24, 1992, the agents served Atlantic with a Temporary Restraining Order which froze the assets of Atlantic and Bell/Asco. McNaughton was not a party named in this Order.

25. Agent Hilborn told Agent Sid Perry about his contact with McNaughton the evening of November 24, 1994. He also told Agent Perry about Attorney Smida's involvement.

As to statements made December 1, 1992

26. On November 25 or 26, 1992, McNaughton was advised by the attorneys for Atlantic that they could not represent him and that he should obtain personal counsel.

27. On November 30, 1992, FBI Agent Sidney Perry called McNaughton on the telephone and invited him to the FBI office in Philadelphia to review the evidence against him, specifically a videotape and audiotapes. Perry told McNaughton that if he chose to come to the FBI office he would be free to leave and would not be arrested.

28. McNaughton went to the FBI office in Philadelphia on December 1, 1992, and went with Agent Perry to an IRS conference room in the same building. An audiotape and a videotape were played for him. Afterwards McNaughton agreed to be interviewed, and was interviewed by Agent Perry in the IRS conference room for approximately one and one-half hours.

29. McNaughton was not advised of his Miranda rights on December 1, 1992. Agent Perry did not tell McNaughton that the interview on December 1, 1992 would be "off the record". Agent Perry gave McNaughton an explanation of the types of charges that could be brought against him, the accompanying penalties under the Sentencing Guidelines and the possible impact of cooperation on sentencing. Agent Perry did not make any promises to McNaughton, and did not discuss dropping or declining to bring charges against him.

30. McNaughton was not placed under arrest on December 1, 1992. He was not patted down, handcuffed, or otherwise physically restrained and was told that he was free to leave at all times. McNaughton admitted that he understood that he was free to leave at all times.

31. McNaughton did not tell Agent Perry on December 1, 1992 that he was represented by Attorney Smida or any other attorney, nor did he indicate that he wished to speak with an attorney.

32. After the interview ended, McNaughton pulled a sheet of paper from his pocket which contained the names of two attorneys, asked for Agent Perry's opinion of these attorneys and indicated that he might want to retain an attorney.

33. At some point after December 1, 1992, McNaughton retained attorney Robert Welsh to represent him in this matter.

*CONCLUSIONS OF LAW*

**As to both sets of statements**

1. *The manner in which the agents questioned McNaughton on November 24, 1992 and December 1, 1992 did not violate his rights under* Miranda v. Arizona *and its progeny*

 Law enforcement personnel are required to give *Miranda* warnings only where there has been such a restriction on a person's freedom as to render him "in custody." *California v. Beheler,* 463 U.S. 1121, 1124, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1983). The presence of armed agents, while undoubtably frightening, is not enough to create a custodial situation. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (holding that *Miranda* warnings need not proceed questioning in a "coercive environment" if there is no restraint). When a person has not been arrested, a finding of "custody" requires some indication that the officers would not have heeded that person's request to depart. *Patterson v. Cuyler,* 729 F.2d 925, 929 (3d Cir. 1984).

 I conclude that Mr. McNaughton was not "in custody" on either November 24 or December 1, 1992, and therefore not entitled to *Miranda* warnings. Mr. McNaughton was not hand cuffed, patted down, placed under arrest, nor told he could not leave on either occasion. He was permitted to receive telephone calls and to leave to speak with Attorney Smida when he asked to do so on November 24.

 Mr. McNaughton concedes that he understood that he was free to leave during his interview with Agent Perry on December 1, 1992. He also argues, however, that the government violated his rights under *Miranda* and *Edwards v. Arizona* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), when Agent Perry re-initiated the questioning of McNaughton after he had invoked his Fifth Amendment right to have counsel present during questioning. Under *Edwards,* once a suspect invokes his right under *Miranda* to have a lawyer present during questioning, there can be no further questioning without an attorney unless the suspect initiates it.

*Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85.

The protections of *Miranda* and *Edwards,* however, only apply to custodial interrogation. *See Arizona v. Roberson,* 486 U.S. 675, 685, 108 S.Ct. 2093, 2100, 100 L.Ed.2d 704 (1988) (the Fifth Amendment right to counsel during custodial interrogation is meant to protect an accused against "the inherent pressures of custodial interrogation"); *Edwards,* 451 U.S. at 482, 101 S.Ct. at 1883 ("*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation."). Because I have held that McNaughton was not subjected to custodial interrogation on either November 24 or December 1, 1992, I also hold that Agent Perry did not violate the Fifth Amendment by contacting McNaughton for further questioning after he had once refused to answer questions without a lawyer present.

2. *McNaughton's statements on November 24 and December 1, 1992 were made voluntarily*

 Where interrogation is noncustodial, to determine the voluntariness of a confession I must consider the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). The issue is whether the defendant's will was overborne when he made incriminating statements. *Id.* at 225–26, 93 S.Ct. at 2046–47. The factors to be considered include

the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as deprivation of food or sleep.

*Id.* at 226, 93 S.Ct. at 2047.

 Although a statement by an agent that cooperation will be brought to the attention of prosecuting authorities does not automatically render a confession involuntary, *United States v. Fraction,* 795 F.2d 12 (3d Cir.1986), there are times when promises of

leniency or confidentiality made by a law enforcement officer can justify a finding that the defendant's will was overborne and any statement made as a result of those promises was involuntary. *U.S. v. Walton,* 10 F.3d 1024, 1028–29 (3d Cir.1993). McNaughton argues that suppression of his statements is justified under *Walton.*

In *Walton,* the defendant met with two agents in a park. One of the agents, who had been a high school classmate of the defendant, told him that he could speak "off the cuff". The agent testified at trial that he *did* mean to say that the defendant's statements would not be used against him, and that he did not think differently until a supervisor told him they would use the statements despite his promise. The Third Circuit held that, given the casual setting of the conversation, the prior relationship between the defendant and the agent and the fact that the agent referred to that relationship, and the fact that, at the time of the conversation, the defendant didn't know that he was the subject of an investigation, the defendant was deprived of the ability to make an intelligent choice between exercising and waiving his privilege to remain silent. *Walton,* at 1030.

The facts here are very different. The agents who interviewed McNaughton did not promise that anything would be "off the record"; they did explain the potential benefits of cooperation in terms of sentencing, but did not make any promises to McNaughton about what charges would be brought against him or what sentence he would receive. Moreover, none of the factors that the Third Circuit found significant in *Walton* are present here: McNaughton knew that he was a target of the government's investigation and there was no personal relationship or casual situation to lull McNaughton into believing that this was anything but a formal investigatory interview.

Neither do the *Schneckloth* factors support a finding that McNaughton's statements were involuntary. Mr. McNaughton is a mature adult of professional background, who was not subjected to prolonged detention,

verbal harassment, or physical discomfort. I find that his will was not overborne by any statements or conduct of government agents on November 24 or December 1, 1992.

3. *McNaughton's statements on November 24 and December 1, 1992 were not made during the course of plea negotiations*

█ The current version of Rule 11(e)(6)(D) of the Federal Rules of Criminal Procedure provides, in pertinent part, that:

Except as otherwise provided in this paragraph, evidence of the following is not … admissible against the defendant who made the plea or was a participant in the plea discussions …

(D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Fed.R.Crim.P. 11(e)(6).[1]

This rule was amended in 1979 in order to narrow the scope of the evidentiary exclusion, which used to cover all "statements made in connection with, and relevant to, any of the foregoing pleas or offers". *See United States v. Sebetich,* 776 F.2d 412, 421 (3d Cir.1985) (reviewing legislative history of the amendment), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988).

In *Sebetich,* the Third Circuit upheld the admission of statements the defendant had sought to characterize as plea negotiations because 1) neither the defendant nor the government agent intended to reach a plea agreement during the discussions; 2) the defendant could not reasonably have believed that the agent had authority to plea bargain; and 3) the statements were not made to an attorney for the government. *Sebetich,* 776 F.2d at 421–22.

Neither McNaughton nor the agents who interviewed him intended to negotiate a plea agreement on either November 24 or December 1, 1992. Neither interview included discussions of a guilty plea or negotiation about

---

1. McNaughton also cites Fed.R.Evid. 410, which is identical in text and analysis. *See U.S. v.*

*Sebetich,* 776 F.2d 412, 421 n. 13 (3rd Cir.1985).

charges and neither agent made any promises to McNaughton about sentencing. Furthermore, McNaughton could not reasonably have believed that Hilborn had authority to plea bargain, since Hilborn specifically told McNaughton that he was not authorized to make any promises. Finally, these discussions did not involve an attorney for the government; while the Third Circuit declined to reach the question of whether the new Rule 11(e)(6)(D) protects only formal plea negotiations with a government attorney, the absence of a attorney is a factor which weighs against a finding that the discussions were plea negotiations. *See Sebetich,* 776 F.2d at 422 n. 15. Upon consideration of the factors outlined in *Sebetich,* I conclude that McNaughton's statements were not made during the course of plea negotiations, and will not be excluded under Fed.R.Crim.P. 11(e)(6)(D).

**As to statements made December 1, 1992**

4. *The statements of McNaughton made during the December 1, 1992 interview with government agents should not be suppressed pursuant to Pennsylvania Rule of Professional Conduct 4.2*

McNaughton argues that the statements he made on December 1, 1992 should be suppressed because the government violated the ethical rule which prohibits communication between a lawyer and a party represented by another lawyer regarding the subject of the representation.

Rule 4.2 of the Pennsylvania Rules of Professional Conduct[2] ("Rule 4.2" or "the anti-communication rule") provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

In order to suppress McNaughton's statements of December 1, 1992, I would have to find: a) that the Rule would prohibit contact by Agent Perry, although he is not an attorney; b) that McNaughton was represented

by counsel when Agent Perry discussed the investigation with him on December 1, 1992, and that Perry knew it; c) that McNaughton is entitled to the protection of the Rule; and d) that suppression is an appropriate remedy for such a violation.

■ a) I find that Agent Perry is subject to the requirements of the anti-communication rule to the same extent as the government attorneys. Pennsylvania Rule of Professional Conduct 8.4(a) prohibits a lawyer from using others to violate or circumvent the rules of professional conduct. Thus, Rule 4.2 bars communication by non-attorney government law-enforcement officers where those communications are made with the knowledge or at the direction of·an attorney for the government. *United States v. Jamil,* 707 F.2d 638, 646 (2d Cir.1983) (no ethics violation where court found that government attorney was neither aware of nor involved in undercover contact with represented defendant); *United States v. Lemonakis,* 485 F.2d 941, 956 (D.C.Cir.1973) (affirming admission of tape recording of conversation between informer and represented defendant in part because the informer was not acting as the "alter ego" of the U.S. Attorney's office), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974); *see also* Roger C. Crampton and Lisa K. Udell, *State Ethics Rules and Federal Prosecutors: The Controversies Over the Anti–Contact and Subpoena Rules,* 53 U.Pitt.L.Rev. 291, 344 (1992) (collecting cases).

While there was evidence that attorneys for the government were aware of and working with the FBI and IRS in the investigation of this matter, there was no testimony as to whether Agent Perry interviewed Mr. McNaughton at the direction of or with the consent of an attorney for the government. The government points to this lack of evidence as support for a finding that Agent Perry was not acting as the "alter.ego" of the prosecuting attorneys. It is the government's burden to establish that a challenged confession is admissible, however, not the burden of the defendant to show that it is not. *Lego v. Twomey,* 404 U.S. 477, 489, 92

2. The Pennsylvania Rules of Professional Conduct apply in actions before this court pursuant

to Local Rule 14 of the United States District Court for the Eastern District of Pennsylvania.

S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). The government has not established that Agent Perry was not acting at the request of an attorney for the government. I conclude therefore, on the basis of the record before me, that Agent Perry was acting as the "alter ego" of the prosecuting attorneys, and that he is therefore subject to the restrictions of the anti-communication rule to the same extent that they are.

■ b) I conclude that Richard McNaughton was not personally represented by counsel during the search of the Atlantic office on November 24, 1992, nor at any time before he was interviewed by Agent Perry. If he was personally represented by the company's attorneys at any time on November 24, 1992, it would appear that the representation ceased on November 25 or 26 when Atlantic's attorneys informed McNaughton that the company attorney would not represent him in an individual capacity and that he would have to retain private counsel. *See* Pennsylvania Rule of Professional Conduct 1.13 and Comment.[3]

The inquiry does not end at this point, however, since Attorney Smida was clearly representing Atlantic in connection with this investigation on November 24, 1992, and that representation continued at least through December 1, 1992, when Agent Perry interviewed McNaughton. The official comment to Rule 4.2 states:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a manageri-

al responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

As the Manager of Wholesale Fuel Sales for Atlantic, McNaughton clearly falls within the scope of the rule. Thus, while McNaughton was not personally represented, he was shielded from contact by the government attorneys and their alter-egos because of Smida's representation of Atlantic. FBI Agent Hilborn and Revenue Enforcement Officer Brennan were obviously aware of this representation, since they sought Attorney Smida's cooperation when they wished to ask McNaughton questions after the termination of the initial interview, and when they needed to discuss which items from his briefcase would be seized. FBI Agent Perry was aware that an attorney for Atlantic had been present during the search and had monitored McNaughton's interactions with the government agents (Finding of Fact #25). Atlantic was clearly an adverse "party" after it was served with the restraining order on November 24, 1992, and communication with McNaughton was prohibited by Rule 4.2.

■ c) McNaughton is not, however, entitled to the protection of the anti-communication rule in this circumstance.[4] Because McNaughton was not personally represented by an attorney, he had no attorney-client relationship to be violated. McNaughton has not argued that he can benefit from the government's invasion of Atlantic's attorney-client relationship, and would not have standing to do so in the context of a motion to suppress. *See Rakas v. Illinois*, 439 U.S.

---

**3.** A lawyer cannot represent both an organization and one of its officers if that representation would violate the rule against representing clients of adverse interest. "In such circumstances the lawyer should advise any constituent, whose interest that lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation."

**4.** I need not determine whether McNaughton was a "party" because of my conclusion that he was not personally represented by any attorney

when he spoke with Agent Perry on November 30 and December 1, 1992. Because Atlantic clearly was a "party" under any standard, having been served with a forfeiture order restraining its assets, I need not determine whether the anti-communication rule restricts government contact with represented criminal suspects before formal criminal proceedings begin. *Compare United States v. Hammad*, 858 F.2d 834 (2d Cir.1988), *cert. denied*, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990) *with United States v. Ryans*, 903 F.2d 731, 735 (10th Cir.), *cert. denied*, 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990).

128, 133–34, 99 S.Ct. 421, 424–26, 58 L.Ed.2d 387 (1978) (court may not suppress evidence on grounds that evidence was obtained in manner that violated rights of someone other than the defendant); *United States v. Payner*, 447 U.S. 727, 735 N. 7, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980) (holding that evidence would not be suppressed on behalf of defendant without standing even where evidence was obtained through blatant police misconduct).

■■■ d) Even if I were to find that McNaughton could challenge admission of the December 1, 1992 interview because of the invasion of Atlantic's attorney-client relationship, I would not suppress the statements he made in that interview; suppression of evidence is not an appropriate remedy for an ethics violation. The Code of Professional Responsibility is not enforced under the constitutional exclusionary rule, but only under a federal court's general supervisory powers, which are subject to the control of Congress. *United States v. Crook*, 502 F.2d 1378, 1380–81 (3d Cir.1974), *cert. denied*, 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975). In the Omnibus Crime Control and Safe Streets Act of 1968, Congress provided that '(i)f the trial judge determines that the confession was voluntarily made it shall be admitted in evidence ...' 18 U.S.C. § 3501(a). The court cannot, in exercising merely supervisory powers, disregard that congressional mandate. *Crook*, 502 F.2d at 1380. Where, as here, there is no constitutional violation, a district court is bound, in determining admissibility, by 18 U.S.C. § 3501(a).[5] *Id.*

The fact that Atlantic, rather than McNaughton, is the party injured by the government's conduct makes suppression even less appropriate. In *United States v. Payner*, 447 U.S. 727, 735 n. 7, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980), the Supreme Court stated:

> Federal courts may use their supervisory power in some circumstances to exclude evidence taken from the *defendant* in "willful disobedience of law" ... This Court has never held however, that the supervisory power authorizes suppression of evidence obtained from third parties in violation of Constitution, statute or rule.

(emphasis in the original).

McNaughton's only response to this authority is to point out that the Second Circuit has approved suppression as one of the possible remedies for ethical rules violations. *United States v. Hammad*, 858 F.2d 834, 842 (2d Cir.1988), *cert. denied*, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990). In the face of clear Third Circuit precedent, however, this authority is not persuasive. I will deny the motion to suppress.

### ORDER

**AND NOW**, this 4th day of April 1994, the motion of defendant Richard McNaughton to suppress statements is **DENIED.**

---

**5.** Since the Third Circuit held that the conduct in *Crook* did not violate the anti-contact rule, the statements regarding suppression are technically dicta. I believe, however, that the Third Circuit would have made the same determination as to suppression if it *had* found an ethical violation, since the same rationale would apply.