Gary C. GOODMAN, Appellant,

v.

PENNSYLVANIA TURNPIKE COM-
MISSION; Bonney C. Daubenspeck;
Mitchell Rubin; James F. Malone;
James J. Dodaro; Bradley Mallory, in
his capacity as Pennsylvania Turnpike
Commissioner; John Durbin; Debo-
rah L. Everly, Pennsylvania Turnpike
Commission, Appellant.

Nos. 00–2340, 00–2493.

United States Court of Appeals,
Third Circuit.

Argued: May 21, 2001.

Filed: June 24, 2002.

Edward M. Brennan (argued), Pottsville, Pennsylvania, for Gary C. Goodman.

Michael M. Baylson (argued), Frank E. Noyes, II, Duane, Morris & Heckscher LLP, Philadelphia, Pennsylvania, William Chestnutt, Pennsylvania Turnpike Commission, Harrisburg, Pennsylvania, for Pennsylvania Turnpike Commission, et al.

Before: BECKER, Chief Judge,
SLOVITER and AMBRO, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

In this opinion we address two appeals. First, we consider the cross-appeal of the Pennsylvania Turnpike Commission (the "Commission"). It contends that the Magistrate Judge erred in three respects: (1) in making three evidentiary rulings; (2) in denying its motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) and (b); and (3) in denying its motion for a new trial pursuant to Federal Rule of Civil Procedure 59. Because we disagree with all of the Commission's contentions, we affirm. Second, we address Appellant Gary C. Goodman's claim that the Magistrate Judge abused his discretion by setting his attorney's fees, which the Commission pays pursuant to 42 U.S.C. § 1988, too low. We find no abuse of discretion and affirm.

### I. Facts and Procedural History

As this appeal follows a jury verdict in Goodman's favor, we view the evidence in the light most favorable to the winner. See United States v. Gricco, 277 F.3d 339, 348 (3d Cir.2002). Goodman began his career with the Commission in 1976 as an Equipment Operator in the maintenance department. After fifteen months, Goodman moved into fare collections and received training as a Toll Collector before becoming an Assistant District Manager. In that capacity, Goodman reported to Frank Flaherty, the District Manager. In December of 1994, Flaherty retired, leaving a vacancy in his position as District V Manager for Fare Collections. On December 23, 1994, the Commission named Goodman Acting District Manager [1] and posted the promotion opportunity.

The Commission follows specific policies governing the promotion process outlined in Policy Letter 65, Policy and Procedure for Promoting Employees. Policy Letter 65 was adopted in 1992, after consultation with outside legal counsel, to improve the efficiency and fairness of promotion decisions, and to comply with the United States Supreme Court's decision in Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), which held that public employers could be held liable under 42 U.S.C. § 1983 and the First Amendment for discriminating against certain employees because of their political affiliation. After a job vacancy is properly posted and interested applicants submit the required material, all qualified applicants are sent to the pertinent department head, here the head of Fare Collections. An interview committee from the Fare Collections Department, consisting of the department head and other managers, then conducts interviews. The interview committee forwards the top three to six

---

[1]. Goodman served as Acting District Manager for approximately fourteen months. During his tenure as Acting District Manager, Goodman received no official or written criticism. He received a formal written commendation for his computer work in the Fare Collections Department while he served as Assistant District Manager.

candidates to the Personnel Committee, a five member board that makes personnel recommendations. It must provide the Personnel Committee with a written explanation, based on a set of written criteria, stating why it chose the particular candidates. The Personnel Committee then reviews the attributes of the top candidates and selects a single candidate to recommend to the Turnpike Commissioners (the "Commissioners"), who by statute must make the final decision. Commission policy requires that the Personnel Committee prepare a report for the Commissioners that explains the Committee's recommendation. The Commissioners then accept or reject the recommendation. Typically, they approve the Personnel Committee's recommendation.

The Commission's governing body comprises four Turnpike Commissioners who are appointed by the Governor and confirmed by a two-thirds majority of the State Senate. The Secretary of Transportation sits as a fifth member with the Commissioners. During the promotion process for the District V ·Manager for Fare Collections position, the Commissioners were Robert A. Brady, James J. Dodaro, Robert A. Gleason, Jr., James F. Malone, and Secretary of Transportation Bradley Mallory. From 1985 until the time of trial, the Commissioners were balanced in terms of political affiliation, two Democrats and two Republicans. The Secretary of Transportation, however, tipped the scale in the direction of the political party of the Governor. The Personnel Committee, at the relevant time, consisted of Executive Director John Durbin, Associate Executive Director Deborah Everly, Risk Manager Dennis Genevie, Assistant Executive Director Melvin Shelton, and Assistant Executive Director Michael Kennedy. Each Commissioner is represented by one member of the Personnel Committee, thus maintaining the same split in political affiliation among the Personnel Committee as among the Commissioners. Commissioner Brady was represented by Shelton, Commissioner Dodaro by Genevie, Commissioner Gleason by Everly, and Commissioner Malone by Kennedy. Durbin sat as a controlling, or swing, vote by virtue of his position as Executive Director.

The Commission posted the District V Manager position three times while Goodman was Acting District Manager. Goodman interviewed twice for the position. According to him, after the first interview, the Personnel Committee took no action because a new Governor of a different political party had been elected. Likewise, after the second posting, the Commission conducted no interviews. After the third posting, the Commission once again held interviews. Goodman, along with seven other candidates (including Lee Becker), was interviewed by Samuel Sadler, Deputy Executive Director for Fare Collections, and two other district managers in the Fare Collections Department. This interview committee recommended Goodman, Becker, and Andre Coleman to the Personnel Committee. These candidates obtained the three top scores on the interviews. The candidates were evaluated using such criteria as their education, prior management experience, training, computer literacy, communication skills, and knowledge of the Commission's rules and policies. Goodman received the top score, thirty-six out of a possible forty-one points, while Becker received twenty-nine points and Coleman received twenty points.

At its meeting in February 1996, the Personnel Committee asked Sadler, the member of the interview committee who had summarized the qualifications of each of the candidates, which candidate was best qualified. Goodman contends that Sadler stated that Goodman was the best

qualified candidate and cited his fourteen months of service as Acting District Manager.[2] Also, Goodman alleges that, after much discussion, the Personnel Committee voted on the candidate each member thought was the best. Genevie and Shelton voted for Goodman, while Durbin, Everly, and Kennedy voted for Becker. This vote was split along party lines: the two Democrats voted for Goodman and the three Republicans voted for Becker. Becker is a registered Republican and was the Ward Committeeman for East Penn Township. The Personnel Committee ultimately recommended Becker for the promotion and the Commissioners approved him on February 20, 1996.

Goodman then initiated suit in the Eastern District of Pennsylvania, relying on *Rutan*. He alleges that he was not promoted because he and his family members were registered, active Democrats, and because Becker was a registered Republican affiliated with, and supported by, State Senator James Rhoades. Goodman sued the Commission, as well as seven individual commissioners and executives associated with it. However, two individual defendants, Executive Director John Durbin and Associate Executive Director Deborah Everly, obtained summary judgment in their favor and the remaining individual defendants were voluntarily dismissed before trial. *See Goodman v. Pa. Turnpike Comm.*, No. 96–cv–5921, 1998 WL 159046 (E.D.Pa. Mar.20, 1998) (dismissing Durbin and Everly). The action continued against the Commission and was referred, pursuant to 28 U.S.C. § 636(c) and the consent of both parties, to the Magistrate Judge for trial.

A jury trial began on November 15, 1999, before Magistrate Judge Rapoport, with Goodman offering testimony and exhibits through nineteen witnesses describing the promotion process, the qualifications of the candidates for the promotion, and the facts supporting his claim that political discrimination was a substantial or motivating factor in his failure to receive the promotion. His arguments focused on the political rivalry between the Goodman family and Republican State Senator Rhoades. Goodman claims that political support from Senator Rhoades and his aide, Clyde "Champ" Holman, on behalf of Becker resulted in Becker being promoted instead of Goodman. Goodman produced evidence that Becker was endorsed by Senator Rhoades in a letter drafted by Holman and signed by the Senator. It was addressed to Samuel Carnabuci, Assistant Executive Director of the Western Regional Office of the Commission and a former member of its Personnel Committee. In the letter, Senator Rhoades lauded Becker, and stated that "[e]very possible consideration you can extend to Lee [Becker] in his quest for employment will be greatly appreciated." Goodman further testified that Becker told him that he (Becker) had met with Senator Rhoades and Holman to try to secure the District Manager position. Additionally, Holman testified that he and the Senator met with Commissioner Gleason, though it is unclear what that meeting concerned.[3]

Goodman, himself a member of the Democratic Party, also has deep family ties in partisan politics. The rivalry between the Goodman family and Senator Rhoades dates to 1978, when Goodman's

---

**2.** At trial, two Personnel Committee members, Shelton and Genevie, testified that they recalled Sadler telling them that Goodman was the most qualified candidate. However, when asked at trial if he thought Goodman was the best candidate, Sadler refused to answer the question, stating that all three candidates were qualified and that Goodman answered the most questions correctly.

**3.** Gleason stated in his testimony that the meeting was about his insurance business.

uncle, James Goodman, defeated Rhoades for a seat in the Pennsylvania General Assembly.

All members of the Personnel Committee who were asked at trial denied knowing the political affiliation of either Goodman or Becker. Further, four members of the committee testified that they did not discuss political affiliation at the meeting. Additionally, the members of the Personnel Committee testified that they never saw Senator Rhoades' letter recommending Becker or even knew that he supported Becker.

Goodman produced two items as circumstantial evidence of the political influence behind promotional decisions at the Commission. First, he offered into evidence a document entitled "1993–1994 Application List." That list contained several names with the notation "wants promotion." Next to each name was the source of the application, either "U.S. Mail" or the name of a political figure—in many cases state senators, representatives, or their staff, including Senator Rhoades and his aide Holman. Second, he offered a report entitled "1997 Legislative Budget and Finance Committee Report." This report contained a review of, and recommendations as to, the Commission's promotion policies. The Magistrate Judge accepted both documents into evidence.

Also at trial Becker testified that he heard about his promotion from his boss, Sadler. He specifically stated that he did not hear of the promotion from Holman, and specifically denied ever telling Goodman that he heard about the promotion from Holman. Holman also denied any such conversation occurred.

Goodman's counsel recalled him in an effort to impeach Becker's statement. Over the Commission's objection, Goodman testified that Becker had told him that he, Becker, had learned about his promotion from Holman. Goodman also introduced, over objection, similar testimony from his father, Cornelius Goodman, that Holman told him that Senator Rhoades was responsible for Becker's promotion. Goodman's attorney stated multiple times that he was introducing these statements to impeach Becker's and Holman's contrary testimony under Rule 607 of the Federal Rules of Evidence. In this context, Goodman's counsel did not refer to either statement during his jury summation, and the Magistrate Judge did not give a limiting instruction to the jury.

At the close of Goodman's case, the Commission moved for judgment under Federal Rule of Civil Procedure 50(a) on the basis that Goodman had not established a *prima facie* case of political discrimination. The Magistrate Judge heard oral arguments on the motion, examined the sufficiency of the evidence showing that Goodman's and Becker's political affiliation was a substantial or motivating factor in the promotion decision, and ultimately denied the Commission's motion.

On November 18, 1999, the jury returned a verdict against the Commission, awarding Goodman $215,000. The Commission renewed its motion for judgment under Federal Rule of Civil Procedure 50(b), and in the alternative made a motion for a new trial pursuant to Federal Rule of Civil Procedure 59. The Magistrate Judge denied both by an order entered on July 26, 2000. Also in that order the Magistrate Judge granted Goodman's motion for an interim award of attorney's fees and costs, awarding $87,450.00 in fees and $9,213.15 in costs.

Goodman filed a timely appeal contesting the attorney's fees as too low. The Commission cross-appealed, contesting three evidentiary decisions as well as the denials of its Rule 50 and Rule 59 motions. We address the cross-appeal first.[4]

---

4. Jurisdiction was proper in the District Court under 28 U.S.C. § 1331 because Goodman

## II. *The Political Patronage Trilogy*

The Supreme Court has decided a trilogy of cases that governs our decisions in political patronage cases. In *Elrod v. Burns*, 427 U.S. 347, 372–73, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and again in *Branti v. Finkel*, 445 U.S. 507, 514–15, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Supreme Court ruled that public agencies may not constitutionally discharge employees based on their political affiliation when those employees' positions are neither policymaking nor advisory. *See Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir.1997). It reasoned that an employee's First Amendment right outweighs the Government's interest in maintaining a system of political patronage. *Id.*; *see also Robertson v. Fiore*, 62 F.3d 596, 600 (3d Cir.1995) ("The constitutional prohibition against patronage derives from the coercive aspects of the spoils system which inhibit the rich political discourse protected by the First Amendment. Without the protection afforded by the Constitution, employees might forgo the expression of their political beliefs or artificially change their political association to avoid displeasing their supervisors. Such coercion, whether direct or indirect, is incongruent with a free political marketplace.").

■ However, *Branti* and *Elrod* did carve out an exception for positions that are classified as policymaking or advisory, in which case the Government has the burden of proving that party affiliation is an appropriate requirement for the position. *Branti*, 445 U.S. at 518, 100 S.Ct. 1287 ("[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective

performance of the public office involved."); *Elrod*, 427 U.S. at 368, 96 S.Ct. 2673 (holding that party affiliation may be an acceptable requirement for an employee who "acts as an advisor or formulates plans for the implementation of broad goals"); *see also Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1353 (3d Cir.1994). *Branti* and *Elrod* also held that one could not be discharged for failing to obtain the sponsorship of the controlling political party. *Branti*, 445 U.S. at 516, 100 S.Ct. 1287; *Elrod*, 427 U.S. at 351, 96 S.Ct. 2673.

More than a decade later, the Supreme Court added the third leg of the political patronage trilogy—*Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). In *Rutan*, the Supreme Court extended *Branti* and *Elrod* and ruled that promotions, transfers, recalls, and hiring decisions involving public employees may not be based on party affiliation and support unless the Government can show that party affiliation is an appropriate requirement for the position involved. *Rutan*, 497 U.S. at 75, 110 S.Ct. 2729. "Thus, *Rutan* encompasses claims of political discrimination when an employer takes an adverse employment action because s/he does not want to fill employment positions that would otherwise be available to his or her supporters." *Stephens*, 122 F.3d at 176.

■ With the above precedents in mind, our Court has developed a three-prong test in political patronage discrimination cases. "To make out a claim of discrimination based on political association, a public employee must prove (1) that the employee works for a public agency in a position that does not require a political affiliation, (2) that the employee main-

---

brought his claim of political discrimination pursuant to the First and Fourteenth Amendments to the United States Constitution and

42 U.S.C. § 1983. We exercise our jurisdiction pursuant to 28 U.S.C. § 1291.

tained an affiliation with a political party, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision." *Robertson*, 62 F.3d at 599 (citing *Laskaris v. Thornburgh*, 733 F.2d 260, 265 (3d Cir. 1984)). Implicit in the third prong is a requirement that the plaintiff produce sufficient evidence to show the defendant knew of plaintiff's political persuasion. *Laskaris*, 733 F.2d at 265; *see also Stephens*, 122 F.3d at 177 (splitting the analysis of the third prong into two parts, knowledge and causation). Proof of knowledge can come from direct or circumstantial evidence. *Stephens*, 122 F.3d at 178–79. Finally, if the above elements are satisfied, the employer "may avoid a finding of liability by demonstrating by a preponderance of the evidence that it would have made the same decision even in the absence of the protected affiliation." *Robertson*, 62 F.3d at 599.

### III. *The Commission's Rule 50 Motions for Judgment as a Matter of Law*

■ In filing the Rule 50 motions for judgment as a matter of law, the Commission contended that Goodman did not carry his burden on the third prong of the political patronage analysis. While the parties stipulated as to the first two prongs, the Commission claims that Goodman did not show sufficient proof that it had knowledge of Goodman's political affiliation and that Goodman did not provide legally sufficient evidence to demonstrate

that his political affiliation was a substantial or motivating factor in being denied the promotion.[5] We disagree and thus affirm.

Federal Rule of Civil Procedure 50 states, in pertinent part:

(a) Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59 . . . .

■ We exercise plenary review over orders granting or denying a motion for judgment as a matter of law and apply the

---

**5.** The Commission also contends that Goodman failed to produce, as required by his theory of the case (that Goodman lost the promotion to Becker because Goodman was a Democrat and Becker was a Republican supported by a Republican State Senator), proof of the Commission's knowledge of Becker's political affiliation. However, we find Goodman's theory simply to be that the Commission failed to promote him because of his strong affiliation with the Democratic Party. Therefore, there was no requirement that Goodman produce evidence of the Commission's knowledge of Becker's political affiliation. *See Stephens*, 122 F.3d at 180 ("[I]f the plaintiffs' political affiliation was a substantial or motivating factor in his decision not to promote them, they have established a basis for finding the requisite causation.").

same standard as did the Magistrate Judge. *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993). As with grants of summary judgment, the reviewing court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Generally, a Rule 50 motion should be granted only if evidence is not sufficient for a jury reasonably to find liability. *Lightning Lube*, 4 F.3d at 1166. Although judgment as a matter of law should be granted sparingly, a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion. *See id.* "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (internal quotation omitted).

▮▮▮ Key to surviving a Rule 50 motion is a legally sufficient evidentiary basis for the verdict. The rule in this Circuit is that erroneously admitted evidence should not be considered when ruling on motions for judgment as a matter of law. *Lightning Lube*, 4 F.3d at 1199–1200; *Lippay v. Christos*, 996 F.2d 1490, 1500–01 (3d Cir. 1993). The Supreme Court has recently adopted an analogous rule holding that federal courts of appeals, in reviewing Rule 50(b) motions, have the power first to exclude inadmissible evidence and then to examine the trial record to see if the remaining admissible evidence can support the verdict. *Weisgram v. Marley Co.*, 528 U.S. 440, 457, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000). Additionally, when reviewing a trial record containing inadmissible hearsay, courts of appeals are not limited to remanding to the district court, but rather can review the Rule 50(b) motion without the inadmissible evidence. *Id.*

Before deciding whether the Magistrate Judge properly denied the Rule 50 motions for judgment as a matter of law, we must first determine what evidence was properly before him and therefore should be considered in our Rule 50 analysis. After deciding these issues, we examine whether the Commission had knowledge of Goodman's political affiliation and whether that political affiliation was a substantial or motivating factor in his being denied the promotion.

### A. Evidence Issues

▮▮▮ On appeal, the Commission argues that the Magistrate Judge erroneously admitted three items into evidence: (1) the testimony of Goodman and his father relating to statements that Becker allegedly made to Goodman and that Champ Holman (Senator Rhoades' aide) allegedly made to Goodman's father; (2) Carnabuci's list of entry-level job applicants and testimony regarding it; and (3) excerpts from the 1997 audit report prepared by the Legislative Budget and Finance Committee. We review the Magistrate Judge's evidentiary rulings for abuse of discretion. *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 111 (3d Cir.2001).

#### 1. Alleged Hearsay Statements of Goodman and his Father

▮▮▮ The Magistrate Judge admitted Goodman's testimony that Becker told him that "Champ [Holman] called me last night and told me that I got the job." This testimony followed Becker's taking the stand and denying that he learned of the promotion from Holman. The Magistrate Judge also admitted testimony by Cornelius Goodman, Goodman's father, that Holman twice told him that Senator Rhoades was "to blame" for Becker's promotion over Goodman. This testimony similarly came after Holman testified that he did

not make those statements. The Commission argues that both statements were inadmissible hearsay offered for the truth of the matter asserted. On the other hand, Goodman argues that the statements were not hearsay and were admissible under Federal Rule of Evidence 607, which says that "the credibility of a witness may be attacked by any party, including the party calling the witness." [6]

We conclude that under the circumstances these statements should not be deemed hearsay. Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." In this case, Goodman's counsel noted explicitly at trial that the statements of Goodman and his father were introduced to impeach the testimony of Becker and Holman. It made sense for Goodman to introduce the statements for this purpose. Regardless whether Holman actually told Becker about his promotion, and regardless whether Senator Rhoades was in fact "to blame" for the promotion, witnesses who make such statements and later deny them tend to lack credibility, and may be impeached on that ground. Thus, the statements are direct evidence by which the jury could assess Becker's and Holman's truthfulness. In this case they were not introduced "to prove the truth of the matter asserted" and therefore lack the defining characteristic of hearsay under the Federal Rules.

■ The Commission points to our holding in *United States v. Sebetich*, 776

F.2d 412 (3d Cir.1985), as supporting its position. In that case, we held that "[i]t is well established ... that witnesses may not be called for the purposes of circumventing the hearsay rule by means of Rule 607." *Id.* at 429. A party can attack a witness's credibility using otherwise inadmissible evidence, but cannot pretend that inadmissible hearsay evidence is being used to impeach a witness so that the jury will hear its substance. In *Sebetich*, two bank robbery defendants had evidence that another man named Chester Sala had told people that he intended to commit the bank robberies of which the defendants were accused. The defendants sought to call a witness, Williams, to testify to Sala's statements, but the District Court refused to admit the testimony because it was hearsay.[7] The defendants argued that they should have been permitted to call Sala himself and, assuming that he denied making the statement, impeach his testimony through their witness, Williams, who would testify to the statement. Williams' testimony, although superficially introduced for the purpose of impeaching Sala's credibility, would therefore reveal to the jury the defendants' substantive argument that Sala committed the bank robberies. Not surprisingly, we concluded that a defendant may not invoke "impeachment" as a talisman to circumvent the hearsay rules.

■ But *Sebetich* does not apply to this case. Sebetich and his codefendants were trying to admit Sala's statements for substantive purposes under a hearsay exception at the same time that they were

---

6. In his appellate brief, Goodman deemphasizes the Rule 607 argument and contends that the statements were admissible under Rule 803(3), which provides a hearsay exception for the declarant's then existing state of mind. We disagree and find the cases that Goodman cites for this proposition not on point. However, we will focus on his original argument that the statements are not hearsay

because they were introduced for impeachment and not to prove the truth of the matter asserted.

7. In fact, as *Sebetich* notes, this evidentiary ruling was erroneous, because the statement was admissible under the state of mind exception to the hearsay rule. Fed.R.Evid. 803(3). *Sebetich*, 776 F.2d at 428.

ostensibly proposing to admit it for "impeachment" purposes under Rule 607. It was obvious that their intent was to place the substance of the statement before the jury. Here, by contrast, Goodman's counsel made it clear that he was introducing the disputed testimony for impeachment purposes under Rule 607. Moreover, in his closing remarks to the jury Goodman's counsel made no mention of these statements as substantive evidence, a step he likely would have taken had he intended the statements to prove the truth of the matter asserted. Moreover, the evidence does not show that Goodman's counsel acted in bad faith when he engaged in these actions. *See United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir.1984) (finding that, because the prosecutor did not act in bad faith, the District Court properly admitted evidence for impeachment purposes that the defendant insisted was being used as hearsay).[8]

In addition, unlike here, the attempt to admit the putative impeachment evidence in *Sebetich* lacked credibility on its face because Sala was otherwise uninvolved in the case and his credibility therefore did not matter. What mattered is whether he actually did rob the banks that the defendants were accused of robbing. Indeed, the defendants in *Sebetich* must have hoped that the jury would find Sala credible so that his statements would exonerate them. By contrast, our case turns heavily on questions of motive, intent, and credibility—whether Becker and Holman tend to tell inconsistent stories about political affiliation matters regardless whether those stories are true.

But even if the statements were hearsay offered by way of impeachment as a subterfuge to put into evidence otherwise inadmissible evidence, their admission was harmless. "In reviewing evidentiary rulings, if we find nonconstitutional error in a civil suit, such error is harmless only 'if it is highly probable that the error did not affect the outcome of the case.'" *Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 191 (3d Cir.1994) (quoting *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 53, 59 (3d Cir.1989)). Likewise, Federal Rule of Civil Procedure 61 reads in relevant part: "No error in either the admission or the exclusion of evidence ... is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such actions appears to the court inconsistent with substantial justice." In this case, we ask whether it is "highly probable" that the jury would have reached the same verdict absent the alleged hearsay evidence. We conclude that it is.

Even if the District Court was wrong that the statements are not hearsay, the overall evidence, which we describe more fully in Part III(B), was sufficient to support the jury's verdict with or without these statements. The jury heard extensive evidence that the Commission knew about and considered Goodman's political affiliation. Moreover, Goodman's counsel explicitly described the disputed statements as impeachment evidence and did not mention them as substantive evidence during his closing arguments. Those steps

---

**8.** Nor was it improper under the hearsay rule for Goodman's counsel to question Becker in the first place about hearing of his promotion from Holman. What is significant about that testimony is that the conversation took place, which suggests circumstantially that Becker's political ties helped secure his promotion. Becker's testimony that the conversation occurred cannot be hearsay because he experienced it firsthand. The truth of the matter asserted in the conversation—that Becker received the promotion—is not in issue. That fact is obviously true. Thus, even if its admission was erroneous, it would be harmless error.

made it significantly less likely that the jury relied on them in reaching its decision.[9] Finally, even if the evidence was hearsay and thus inadmissible for substantive purposes, it still shows that Holman and Becker contradicted themselves on this issue and thus tends to impeach their testimony.

In summary, we affirm the Magistrate Judge's admission of the statements as non-hearsay pursuant to Rule 801. Because the statements were not admitted to prove the truth of the matter asserted, they were not hearsay. In any case, we do not rely on them to support the Magistrate Judge's denial of the Rule 50 motions and conclude that the jury would have returned the same verdict regardless whether they were admitted. Thus, even if the statements were hearsay admitted *sub rosa* as substantive evidence, we find them harmless.

### 2. *Carnabuci's List*

■ Second, the Commission contests the admission into evidence of a document entitled "1993–1994 Application List." Sam Carnabuci, a former member of the Commission's Personnel Committee, testified at trial as to this document. It contains the names of both entry-level and promotion applicants, the date of application, and the "source" for each name. The source, the means by which the applicant made known his application to the Commission, was either a person's name or "U.S. Mail." Many of the names listed as sources were state senators, state representatives, or their aides (including Holman). Some of the names contained notations, including the notation "wants promotion." Carnabuci testified that this notation meant that the

listed person wanted a promotion within the Commission.

The Commission objected to the list "because it is overwhelmingly concerning hires rather than promotions," *i.e.*, because it was highly prejudicial and only slightly probative. The Commission argues that the list "is irrelevant and unfairly prejudicial" because Carnabuci's list "contains three to four references to persons seeking promotions out of hundreds of entries over nine pages." Commission's Br. at 40. Because hiring actions at the Commission, unlike promotions, are allowed to involve referrals from legislators and other politicians, the Commission argues that the admission of the entire list "created a strong and harmful (but unsubstantiated) impression that political considerations were routinely used in personnel matters" at the Commission. *Id.*

Although not explicitly, the Commission contends that the Magistrate Judge abused his discretion when he erroneously admitted the list. It presents this argument under Federal Rule of Evidence 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Commission claims that the unfair prejudicial effect of the list substantially outweighs its probative value.

The list certainly contains relevant evidence, *i.e.*, the names of Commission employees seeking promotions and a political "source" for their application. The Commission concedes this much when it argues that the Magistrate Judge should have

---

9. This issue would not even surface, of course, if the trial judge had given a limiting instruction to the jury to preclude any consideration by the jurors of the arguably hearsay statements. While we encourage this prophylactic measure in future cases, in this case we do not believe that the statements, even if admitted in error, affected the trial outcome.

admitted the list with all information redacted except those individuals noted as "wants promotion." Commission Br. at 40–41. Additionally, in his deposition of Carnabuci, Goodman's attorney asked Carnabuci about the fact that one of the names on the list—Frank Syzdek—did not have "wants a promotion" next to his name but was in fact someone who wanted and received a promotion, according to the testimony of Senator Rhoades. Carnabuci stated that, although it was his normal practice to write "wants promotion" next to the name of someone who wanted a promotion, he could not explain why that was not done with Syzdek's name. This testimony cast doubt on the assertion that only those names with "wants promotion" next to them were promotion candidates, making plausible the inference that throughout the list there were possible promotion candidates.

More importantly, even though the list was dated one or two years before the material events in this case occurred, it was relevant because it showed the existence of political influence on promotions after the *Rutan* decision and the adoption of Policy Letter 65. Furthermore, Carnabuci was on the Personnel Committee at the time he had the list, which shows specifically that there was political influence on Personnel Committee decisions after *Rutan*.

Given the relevance and probative value of the list, the Magistrate Judge did not abuse his discretion in admitting it into evidence. We therefore affirm his evidentiary ruling, and will later consider this

substantive evidence in the Rule 50 analysis.

### 3. *1997 Legislative Budget and Finance Committee Report*

Finally, the Commission contests the admission of excerpts from the 1997 Legislative Budget and Finance Committee Report [10] as unfairly prejudicial under Rule 403. It contends that the Report "had no probative value because it only discussed the [Legislative Budget and Finance Committee's] views that promotion practices at the Commission were not optimum, and should be done in a different way," and was not relevant to whether Goodman was denied a promotion for political reasons. The Commission also contends that admission of the Report "created an unfairly prejudicial stigma that the Commission's promotions are subject to political influence."

On the other hand, Goodman argues that the Report called into question whether the Commission was following the strictures of *Rutan* and Policy Letter 65. He posits that while the Report did not contain an explicit statement that the Commission was violating its own internal policies as well as the Supreme Court's clear mandate in *Rutan*, it contained evidence from which the jury could infer that the Commission was violating those policies. We agree and hold that the Magistrate Judge did not abuse his discretion in admitting the Report into evidence.

Again, Federal Rule of Evidence 403 allows a court to exclude evidence

---

**10.** The Report was based on a factual investigation conducted by a public agency, and was admitted under an exception to the hearsay rule for public records and reports. Fed. R.Evid. 803(8)(C). Rule 803(8)(C) permits evidence of "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The Commission has given us no reason to doubt the Report's trustworthiness, so we conclude that it is reliable and qualifies for the hearsay exception. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).

when the unfair prejudicial effect substantially outweighs the evidence's probative value. However, "the ... prejudice against which the law guards [is] ... *unfair* prejudice—... prejudice of the sort which cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found." *Wagenmann v. Adams*, 829 F.2d 196, 217 (1st Cir.1987) (emphasis added). "[P]rejudice does not simply mean damage to the opponent's cause." 1 *McCormick on Evidence* § 185 at 645 (John W. Strong, et al. eds., 5th ed.1999). If it did, most relevant evidence would be deemed "prejudicial." However, the fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403. Excluded evidence must be unfairly prejudicial, not just prejudicial.

Here, there is no doubt that the Report prejudices the Commission's position. The Commission admits as much in the inconsistent positions it advocates, arguing that the Report contains no relevant evidence as to Goodman's claim that political considerations played a part in his not receiving the promotion, and at the same time claiming that the Report creates a "stigma" that politics play a role in promotions at the Commission. The question is whether the Report's danger of unfair prejudice substantially outweighs its probative value.

The Report's section on promotions begins with a description of the Commission's promotion process, and then discusses *Rutan* and Policy Letter 65, specifically stating that "referrals based on party affiliation or support are prohibited." That section of the Report then concludes that the Commission "has not adopted ... promotion policies in line with merit-based principles of personnel administration." Finally, after discussing the Human Resources Department, the Personnel Committee, and merit-based promotions, the Report concludes: "The [Commission] should adopt and implement a merit-based ... promotion system, abolish the Personnel Committee, and delegate to the Human Resources Department full authority and responsibility for all traditional functions associated with modern personnel administration in a public sector organization."

We believe that the Report strongly implies, although never explicitly states, that the Commission uses political patronage in its promotions. Evidence that the Commission engages in political favoritism, even after *Rutan* and Policy Letter 65, is clearly relevant. While this information might surely prejudice the Commission, the prejudice is not unfair. In any case, the Magistrate Judge did not abuse his discretion in finding that the danger of unfair prejudice did not substantially outweigh the report's probative value. He thus properly admitted it.

B. *Knowledge of Political Affiliation*

Having determined what evidence can be considered in evaluating the propriety of the denial of the Rule 50 motions, we look to both aspects of the contested third prong of the political patronage test: knowledge and causation. *See Robertson*, 62 F.3d at 599. We first ask whether the defendant knew of the plaintiff's political persuasion. *Laskaris*, 733 F.2d at 265; *Stephens*, 122 F.3d at 177–79. Proof of knowledge can take the form of direct or circumstantial evidence.

As to the knowledge subprong, two cases from this Circuit frame our analysis. First, under *Laskaris*, even if an employer knows that patronage is a problem in general, plaintiffs alleging wrongful discharge for political reasons pursuant to *Branti* and *Elrod* cannot sustain their burden of proof without any evidence that the employer knew of their political affiliation. *Laskaris*, 733 F.2d at 266. Here, the

Commission denied knowledge of Goodman's political affiliation and cites *Laskaris* in support of its claim that Goodman did not prove knowledge. Second, under *Stephens*, circumstantial evidence can rebut an employer's denials that it knew an employee's political affiliation, and therefore establish knowledge. *Stephens*, 122 F.3d at 177. Despite their factual and legal distinctions, both cases can be read together to support our conclusion that Goodman presented sufficient evidence for a reasonable jury to find that the Commission knew of his strong affiliation with the Democratic Party.

In *Laskaris*, two former Pennsylvania Department of Transportation ("PennDOT") employees sued alleging, pursuant to 42 U.S.C. §§ 1983 and 1985, that their discharges were politically motivated. The two, Democrats, had been discharged eight months after Governor Thornburgh, a Republican, took office. *Laskaris*, 733 F.2d at 262. Our Court was asked to analyze whether the evidence presented at trial would have survived a directed verdict motion at the close of trial. *Id.* at 265 ("[W]e must decide whether [plaintiffs] adduced sufficient evidence from which a jury could reasonably find that their political affiliation was a substantial or motivating factor in their discharge.") The answer to that question turned on whether the plaintiffs produced evidence "sufficient to show that the defendants knew their political persuasions." *Id.* at 265. In ruling that they did not satisfy that burden, we held that the evidence they presented—(1) that the two were Democrats; (2) that they were qualified for their positions; (3) that one was replaced by a Republican; and (4) the existence of a letter from Pennsylvania Representative Peterson to the new PennDOT Secretary saying that it was time to "clean out the political hacks" and that he thought Governor Thornburgh would "clean house with the *Thornburgh broom*"—was "simply insufficient ... to

show that any of the defendants *knew* that [plaintiffs] were Democrats." *Id.* at 265.

In *Stephens*, five police officers sued the City of Allentown, the Mayor, and the President of the Fraternal Order of Police ("FOP"), pursuant to 42 U.S.C. §§ 1983 and 1985, claiming that they were denied promotions because of their political affiliation and because they openly opposed the Mayor's candidacy. *Stephens*, 122 F.3d at 172, 175. The District Court granted the defendants summary judgment on the §§ 1983 and 1985 claims, holding that the police officers did not present " 'evidence sufficient to establish that Mayor Heydt knew their political affiliations' [or] ... 'any direct evidence that Mayor Heydt refused to promote the plaintiffs in order to leave room for his own political supporters.' " *Id.* at 177.

On appeal, our Court held that "a jury may ... infer knowledge on the part of an employer when the employee proffers evidence that the information was generally known to co-workers." *Id.* (distinguishing *Geraci v. Moody–Tottrup, Int'l, Inc.*, 82 F.3d 578, 582 (3d Cir.1996) (where it was "sheer speculation" that co-workers violated plaintiff's trust and told management that she was pregnant)). There, the Mayor denied knowing of plaintiffs' political affiliations or whether they supported or opposed his candidacy. Despite that denial, the police officers offered evidence that the contentious debate among the police ranks drew clear lines of who supported the Mayor and who did not, and that it was well known among their co-workers that they supported the Mayor's opponent. *Id.* at 177–78. In addition, the officers offered circumstantial evidence of an information "pipeline" between the Mayor and his police supporters who knew of plaintiffs' opposition to the Mayor, including continuing communication between FOP leadership concerning personnel policies. *Id.* at 178–

79. In fact, the Mayor himself testified at his deposition that he knew who his supporters were within the police department, but denied knowing his opponents despite testimony that he had confronted one of his opponents within the department. *Id.* at 178. This circumstantial evidence, we held, was enough for a jury to infer the Mayor's knowledge of plaintiffs' political affiliations, and could support a finding that the failure to promote was the result of political discrimination. *Id.* at 179–80.

The Commission points out that, procedurally, *Laskaris* involved judgment as a matter of law whereas *Stephens* involved summary judgment. According to the Commission, we should therefore find *Laskaris* more on point. However, contrary to the Commission's assertion, the quantum of evidence offered to prove the Commission's knowledge of Goodman's political affiliation, viewed "in the light most favorable to [Goodman] and giving [Goodman] the advantage of every fair and reasonable inference," is well beyond that in *Laskaris*.

The Personnel Committee members who considered Goodman's promotion were Shelton, Durbin, Everly, Genevie, and Kennedy. The first four were called by Goodman to testify at trial, and only Genevie suggested that he knew Goodman's political affiliation ("I assumed he was a Democrat because his uncle was ... a Democrat."). All others denied knowledge of his status as an active Democrat.

In an effort to rebut these denials, Goodman offered extensive circumstantial evidence that supported at least an inferential knowledge of his political affiliation. First, Goodman's uncle, Jim Goodman, was extremely active in the Democratic Party, serving as a State Representative from 1964–1980, and in one contentious election defeated Senator Rhoades. Jim Goodman was also a Turnpike Commissioner appointed by a Democratic governor and

served on the Liquor Control Board during Governor Casey's term.

Second, the entire Goodman family participated in Democratic politics. They supported Democratic candidate Mark Singel against Republican candidate Tom Ridge in the 1994 gubernatorial election. Moreover, Goodman's brother, Neil, works for a Democratic state representative. Goodman was active in his uncle's and brother's campaigns as well as the Singel campaign. Champ Holman even testified that he saw Goodman "working the polls." Likewise, Goodman's father, Cornelius Goodman, worked for the Pennsylvania Revenue Department at the same time Personnel Committee member Durbin did, and each knew the other's political affiliation. Also, Cornelius Goodman testified that he made known generally that his family supported Democratic candidates statewide.

Third, each of the Personnel Committee members who testified—Shelton, Durbin, Everly, and Genevie—had a connection to politics, casting doubt on their claims that they were unfamiliar with Goodman's extensive political ties. Shelton was a ward leader under Congressman Brady, who is the Chairman of the Democratic Party for the City of Philadelphia. Durbin worked for the State Senate Appropriations Committee and reported to Senator Tilghman, a Republican, in the 1970s. Everly was a staff member for Republican State Senator Jubelirer from 1981–1991. Genevie was a PennDOT administrator from 1971–1979 and worked closely with state legislators on construction projects. Moreover, each of the Personnel Committee members "represented" a Commissioner on the Committee. The five Commissioners were patronage appointees of the Governor, and, as already noted, the practice was to have two Democrats, two Republicans, and the Secretary of PennDOT (who usually

belonged to the party of the Governor). This political "majority" typically carried through to the Personnel Committee. Commissioner Gleason, in particular, was a Republican County Chairman. He knew of Jim Goodman's political reputation and that the Goodmans were very active in Pennsylvania Democratic politics. In addition, as already mentioned, Genevie knew Jim Goodman and "assumed Goodman was a Democrat because his uncle was ... a Democrat."

Fourth, Senator Rhoades and his aide, Champ Holman, obviously knew the party affiliation of his opponent, Jim Goodman, and that Appellant Goodman worked on his uncle's and other Democratic campaigns in the home town they shared. Rhoades and Holman had frequent communication with the Executive Director of the Commission, Carnabuci and later Durbin, with respect to "recommending" their constituents to entry-level positions and promotions within the Commission. Likewise, Holman and Everly knew each other and had worked together in the State Senate. The jury may well have inferred that Everly knew Goodman's political affiliation through Holman.

We find all of this to be more than sufficient circumstantial evidence to support the Commission's knowledge of Goodman's political affiliation. When analyzing a Rule 50 motion, we view the evidence in the light most favorable to the nonmovant and give that nonmovant the advantage of every fair and reasonable inference. *Lightning Lube*, 4 F.3d at 1166. All of this evidence could support a jury inference that the Personnel Committee members, savvy to and products of Pennsylvania politics themselves, knew of Goodman's Democratic political affiliation despite their denials.

## C. *Substantial Factor*

After determining that Goodman presented sufficient evidence of the Commission's knowledge of his political affiliation to survive the Rule 50 motions, we determine if he presented enough evidence that political affiliation was a substantial or motivating factor in the Commission's decision not to promote him. *See Robertson*, 62 F.3d at 599. This has been labeled the causation requirement: "[I]f [Goodman's] political affiliation was a substantial or motivating factor in [the] decision not to promote [him], [he] ha[s] established a basis for finding the requisite causation." *Stephens*, 122 F.3d at 180. Again, the Commission avers that Goodman did not meet his burden and the Magistrate Judge erred in denying the Rule 50 motions.

"Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097.

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability.... For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant ... evidence that no discrimination had occurred.

*Id.* at 148, 120 S.Ct. 2097. Goodman must show that he put forth evidence that could satisfy his burden of proof. Discrediting the Commission's reason for not promoting him, standing alone, does not necessarily mean he has sustained that burden. We look to the entire record, viewing all the evidence in the light most favorable to

Goodman, to make this determination. *See Reeves*, 530 U.S. at 150, 120 S.Ct. 2097.

At trial, the Personnel Committee members each vehemently denied that politics had any role in their decision to promote Becker over Goodman. In fact, in response to the *Rutan* decision, the Commission adopted Policy 65 to govern promotions, which specifically provided:

> The Commission provides equal opportunity to all persons regardless of ... party affiliation or support. In regard to this final category [party affiliation or support], [in] *Rutan v. Republican Party of Illinois*, the United States Supreme Court held that it is a violation of the First Amendment to make employment-related decisions regarding positions with public employers based on the party affiliation or support of an applicant or employee. Accordingly, recommending someone for promotion, or making any other employment decision, based on party affiliation or support is prohibited.

The Personnel Committee members and the Commission claim to have followed this Policy in their decisions in this case.

Although the Personnel Committee was initially divided in its support for the two candidates, after lengthy discussions and a presentation by the Fare Collections Department head indicating that both were qualified, the Committee chose Becker in a consensus decision. Everly cited her belief that Becker had better interpersonal skills based on her experience with the two. Although she had previously commended Goodman for his computer skills, she believed that interpersonal skills were a better test for the position. Durbin had worked with Becker, and testified that he believed Becker had what the position needed. Sadler, the Fare Collections Department head, testified that he thought each candidate was qualified, but that Goodman had scored higher on the evaluation; however, the Personnel Committee members denied he said this to them. The Personnel Committee members denied having knowledge of Becker's or Goodman's political affiliation, denied ever seeing the letter from Senator Rhoades, denied that any "pipeline" existed from the Commissioners to the Personnel Committee, and denied that politics played a role in the promotion. Further, Senator Rhoades, Champ Holman, and Becker each denied discussing the promotion beyond Becker's request for a general reference letter.

Despite these denials, Goodman introduced sufficient circumstantial evidence to permit a reasonable jury to find that political affiliation was a substantial factor in the decision not to promote him. First, the Commission had a history of improper promotion practices using sponsorship as a factor, which remained uncorrected as of 1996, as documented by the 1997 Legislative Budget and Finance Committee Report. This document strongly implied that political patronage continued to drive promotion decisions at the Commission. Moreover, Carnabuci's list showed that political patronage was still assisting Commission employees in securing promotions, even after *Rutan* and Policy Letter 65. That list included names with the notation "wants promotion" next to them and with "Champ," meaning Champ Holman, listed as the source.

Second, Senator Rhoades, at the request of Becker, wrote a reference letter in support of Becker, addressed to then-Commission Executive Director Carnabuci. Senator Rhoades knew Becker to be an active Republican. He also met with Commissioner Gleason after the letter was written but before the decision to promote Becker was made (though, as noted *supra* n. 3, there was testimony that Senator Rhoades,

Gleason and Holman met to discuss Gleason's insurance business).

Third, Gleason's representative on the Personnel Committee was Everly, and he testified that when he received letters of recommendation concerning promotions, he would pass them on to Everly, asking her to make sure they received consideration. He testified that her response to these requests was "[a]bsolutely, they would." Everly also testified evasively when asked why a previous Democratic member of the personnel committee, Mike Palmero, had been demoted after Tom Ridge became Governor.

Third, Personnel Committee member Sheldon testified that support for the two candidates, while no formal vote was taken, came out along party lines. The two Democrats voted for Goodman while the three Republicans voted for Becker.

Fourth, Goodman had nothing but commendations in his personnel file, several of those written by Everly herself. Moreover, Goodman was Acting District Manager for fourteen months. In that capacity he did not receive any negative reviews.

Fifth, Goodman's evaluation scores were the highest of the three final candidates. Further, Sadler, the representative of the interview committee, recommended Goodman to the Personnel Committee for the promotion.[11]

Our review of the Magistrate Judge's decision is tempered by the contours of Rule 50, and allows us to reverse a denial of a Rule 50 motion only if "viewing the evidence in the light most favorable to [Goodman] and giving [it] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1141 (3d Cir.1993); *accord Lightning Lube,* 4 F.3d at 1166. We conclude that Goodman successfully rebutted the Commission's claim that political affiliation played no part in the decision not to promote him. Further, Goodman produced sufficient circumstantial proof for a jury reasonably to find liability. Hence we affirm the Magistrate Judge's denial of the Commission's Rule 50 motions.

## IV. *Rule 59 Motion for a New Trial*

As part of its Rule 50 motion, the Commission moved, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59. The Magistrate Judge denied that motion and the Commission now appeals. Because we affirm the denial of the Rule 50 motion, we proceed to decide whether the Magistrate Judge properly denied the Rule 59 motion. We hold that he did.

▄▄▄ Federal Rule of Civil Procedure 59 states, in pertinent part:

Rule 59. New Trials; Amendment of Judgments

(a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the

---

**11.** We note that in this evaluation we do not consider the two statements previously discussed in section III.A.1 alleged to be hearsay testimony. We properly exclude these statements because they were not offered as substantive evidence and therefore cannot support a finding that political affiliation was a substantial or motivating factor in the decision not to promote Goodman.

court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

A motion for a new trial should be granted where substantial errors occurred in admission or rejection of evidence. *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 180 (3d Cir.2000). Here, the Commission alleges that it is entitled to a new trial because the Magistrate Judge made three erroneous evidentiary rulings that affected its substantial rights: (1) allowing the alleged hearsay testimony of Goodman and his father, Cornelius Goodman, into evidence; (2) admitting Carnabuci's "1993–1994 Application List" into evidence; and (3) permitting in evidence excerpts from the 1997 Legislative Budget and Finance Committee Report.

However, we have already found that, in the context in which each contested item was admitted, the Magistrate Judge did not err. Additionally, even if the Magistrate Judges had erred in admitting the supposed hearsay evidence, that error is harmless because sufficient other evidence would have resulted in the same outcome at trial. *See supra* § III.A.1. In this context and given no other evidence to support its motion for a new trial, we disagree with the Commission and affirm the Mag-

istrate Judge's denial of the Rule 59 motion for a new trial.

## V. *Counsel Fees*

■ Finally, we address the initial appeal in this case—Goodman's contention that the Magistrate Judge abused his discretion in setting attorney's fees. Because Goodman prevailed in his § 1983 action, the Magistrate Judge shifted Goodman's attorney's fees and costs to the Commission pursuant to 42 U.S.C. § 1988,[12] awarding $87,450 in fees and $9,213.25 in costs. Goodman now argues that the Magistrate Judge abused his discretion in three respects: (1) by choosing an hourly rate that was too low; (2) by applying a contingency multiplier to the fee; and (3) by not increasing the fee for the "superior work" of Goodman's attorney. We review the reasonableness of a fee award for abuse of discretion. *See Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 782 (3d Cir.1995).

■ First, Goodman argues that the Magistrate Judge abused his discretion in setting the reasonable hourly fee at $200. However, this hourly rate was among four that Goodman's counsel recommended as reasonable.[13] Further, the Commission does not object to the $200 hourly rate, instead advocating for the reasonableness of that rate. In fact, several cases suggest

**12.** 42 U.S.C. § 1988 provides, in pertinent part:

    (b) Attorney's fees

    In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C.A. § 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in

its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

**13.** The rates Goodman's counsel suggested as reasonable were $200, $225, $250, and $275. *See Blue Brief* at 17.

that $200 is within the range of reasonableness for fee awards in the Eastern District of Pennsylvania. *See Becker v. ARCO Chem. Co.*, 15 F.Supp.2d 621, 631 (E.D.Pa.1998), *dismissed as moot by* 207 F.3d 176 (3d Cir.2000) ("[A]ttorneys representing plaintiffs in civil rights cases are awarded an hourly rate of between $150 to $250, depending on their level of experience."); *Churchill v. Star Enters.*, No. 97–3527, 1998 WL 254080, at *3–*4 (E.D.Pa. Apr.17, 1998) (partner awarded $250 hourly rate and second-year associate granted $100 hourly rate in a Family and Medical Leave Act action); *Valentin v. Crozer–Chester Medical Center*, No. 95–3722, 1998 WL 32665, at *3 (E.D.Pa. Jan.26, 1998) (lawyer with "seventeen years (experience) in the area[s] of disability, worker's compensation and employment discrimination" was awarded $225 an hour); *Burks v. City of Philadelphia*, 974 F.Supp. 475, 484 n. 7 (E.D.Pa.1997) (self-described "highly experienced and skillful civil rights lawyer" was awarded $205 as an hourly rate); *Smith v. Int'l Servs., Inc.*, No. 95–2038, 1997 WL 667872, at *2–*3 (E.D.Pa. Oct.9, 1997) (lawyer with seven years experience in "complex litigation," but with relatively little experience in employment law, awarded $150 to $160 per hour); *Herkalo v. National Liberty Corp.*, No. 94–CV–7660, 1997 WL 539754, at *3 (E.D.Pa. Aug.7, 1997) (approving hourly rates of $175 to $195 for experienced partners, and $85 to $125 for associates, for sex discrimination suit); *Tobin v. Haverford School*, 936 F.Supp. 284, 292 (E.D.Pa.1996) (lawyer with twenty years at the bar, but with relatively little experience in employment cases, was found to command $165 in the marketplace). Because $200 was among the rates suggested by Goodman's counsel, because the Commission does not contest this as a reasonable rate, and because $200 falls well within the range of reasonableness for similar cases in the Eastern District of Pennsylvania, we cannot say that

the award in this case was unreasonable and therefore cannot say that the Magistrate Judge abused his discretion in setting the reasonable hourly rate and awarding Goodman $87,450.00.

Second, Goodman's argument that the Magistrate Judge erred in failing to apply a contingency multiplier fails. In *City of Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Supreme Court held that contingency multipliers are not permitted for fees awarded pursuant to fee shifting statutes. *Id.* at 566–67, 112 S.Ct. 2638. In holding that "enhancement for contingency is not permitted under the fee shifting statutes at issue," in that case 42 U.S.C. § 6972(e) and 33 U.S.C. § 1365(d), the Court analogized the fee award to those under 42 U.S.C. § 1988 (the provision under which the fee was awarded in Goodman's case), and stated: "[O]ur case law construing what is a 'reasonable' fee applies uniformly to all [fee shifting statutes]." *Id.* at 562, 567, 112 S.Ct. 2638. Thus, we affirm the Magistrate Judge's denial of the contingency multiplier requested by Goodman.

Finally, Goodman asks us to hold that the Magistrate Judge abused his discretion by not finding that his counsel's superior quality of representation made this one of those "very rare circumstances where the attorney's work is so superior and outstanding that it far exceeds the expectations of clients and normal levels of competence," and thus justifies an increase in the awarded fee. *Rode v. Dellarciprete*, 892 F.2d 1177, 1184 (3d Cir.1990). As the Magistrate Judge concluded, we do not find this to be that "rare case," and therefore affirm.

## VI.  *Conclusion*

We affirm the Magistrate Judge's denial of the Rule 50 motions because we find that he properly decided that there was

sufficient evidence from which a jury reasonably could find liability. We similarly affirm his denial of the Commission's Rule 59 motion for a new trial. Finally, we detect no abuse of discretion in the award of attorney's fees to Goodman's counsel.